# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.   A-4494-18
                            A-4495-18

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

S.R. AND M.U.,

     Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF G.R., a Minor.

_____

Submitted December 16, 2020 - Decided  February 10, 2021

Before Judges Ostrer, Accurso and Vernoia.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0116-17.

Joseph E. Krakora, Public Defender, attorney for appellant S.R. (Robyn A. Veasey, Deputy Public

Defender, of counsel; John A. Albright, Designated Counsel, on the briefs).

Joseph E. Krakora, Public Defender, attorney for appellant M.U. (Robyn A. Veasey, Deputy Public Defender, of counsel; Mary Potter, Designated Counsel, on the brief).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Sara M. Gregory, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

In our prior opinion in this consolidated case, N.J. Div. of Child Prot. & Permanency v. S.R. and M.U., No. A-0170-17 (App. Div.), certif. denied, 240 N.J. 34 (2019), we vacated the trial court's 2017 order dismissing the guardianship action premised on the Division's failure to prove all four prongs of the best interests test, N.J.S.A. 30:4C-15.1(a), reinstated the Division's complaint for guardianship, held the Division had established the first two prongs as to both S.R. (Susan) and M.U. (Matt), as well as its reasonable efforts to provide services to both on the third prong, and remanded to a different judge to determine whether placement of Matt and Susan's then-four-and-a-half-year-

old daughter G.R. (Gracie) with Matt's sister Mattie and her fiancé Henry was a viable alternative to termination, and whether Gracie would suffer greater harm from the severing of ties to her natural parents and Matt's extended family than from the permanent disruption of her relationship with her resource parents with whom she had lived since she was six months old.

On remand, Judge Velazquez ordered updated evaluations and conducted a seven-day trial at which several Division workers, a CASA (Court Appointed Special Advocate) volunteer, Matt, Mattie, Henry, Mattie's physician, and the resource parents appeared as fact witnesses, and two of the experts who testified at the first trial, Gerard A. Figurelli, Ph.D., for the Division and Susan Blackwell-Nehlig, Psy.D., for Matt, offered their opinions on the questions remanded.[1] The fact witnesses testified to events occurring between the end of the first trial in August 2017 and its continuation on remand in April 2019.[2]

---

[1] Susan failed to remain in contact with the Division following the first trial and her whereabouts are unknown, apparently even to her own counsel. She did not participate in the remand proceedings, although represented throughout.

[2] We will not burden this opinion with the facts leading up to our decision to remand this case for a new hearing on the third and fourth prongs. Those facts are set out at length in our prior opinion, and we refer the reader to it for a comprehensive account of the history of this matter through conclusion of the first trial. See S.R. and M.U., slip op. at 6-49.

A-4494-18

Specifically, the witnesses recounted the failure of the permanency plan the court ordered after the end of the first trial — termination of parental rights followed by Gracie's adoption by Mattie — the Division's concerns that Mattie was again misusing or abusing her prescription medications based on observations by the caseworkers and the CASA volunteer; and the court-ordered supervision of Mattie's visitation and eventual suspension of her overnight visits with Gracie pending her completion of an independent medical examination. The witnesses also testified to Mattie and Matt's many calls to the child abuse hotline reporting the resource parents were abusing Gracie based on recurring bruising to her legs. Those reports resulted in several investigations of the resource parents by the Division's Institutional Abuse Investigative Unit and Gracie's evaluation at the Audrey Hepburn Children's House following Mattie's allegation of possible sexual abuse.

Although none of those investigations revealed any abuse, the allegations led to a deterioration of the relationship between the resource parents and Mattie and her family, which culminated in a failed mediation between the two families and the resource parents concluding the following day that they could no longer provide a home for Gracie. As recounted in our prior opinion, the resource parents had already adopted two boys the Division had placed with them in

4

foster care. Although the five-year-old, placed with the couple only days after his birth, was too young to understand the import of the Division's repeated inquiries, the ten-year-old, who had memories of his own placement, understood only too well. The resource parents testified that for a brief period following the mediation, they felt the stress engendered by Mattie's unceasing allegations had become too great and the threat they posed to their family too real to permit them to continue as resource parents to Gracie.

Alarmed that Mattie and Matt's repeated unfounded allegations of abuse were threatening Gracie's home with the resource parents, the Division took immediate steps to salvage that placement, obtaining an order in September 2018 directing that "[a]ny concern for new bruises shall be addressed through the attorneys." The order also permitted defense counsel to obtain an independent medical evaluation of Gracie.

Defense counsel never availed themselves of an IME of Gracie, and Mattie never attended her own IME, and thus her overnight visits with Gracie remained suspended through the remand hearing. Mattie also never appeared for her updated psychological evaluation by Dr. Figurelli. Dr. Figurelli and Dr. Blackwell-Nehlig each conducted updated bonding evaluations between Gracie and her resource parents and Gracie and Matt and his family. Dr. Figurelli found

A-4494-18

Matt "affectionate, patient, caring and supportive" with Gracie and she comfortable, spontaneous, and familiar with him. Although noting Matt's relationship with Gracie had become "more developed in nature and scope" since his last evaluation of them twelve months earlier, Figurelli concluded Gracie did not have "an emotionally secure attachment" to Matt and did not see him as a psychological parent.

Dr. Figurelli likewise used the same positive terms in describing Mattie and Henry's interactions with Gracie. He observed that Gracie's interactions with Mattie and Henry were "more active and assertive" than with Matt but less so than with the resource parents, and that her "behavior and requests tended to be more immature and consistent with a somewhat younger level of development" than when she was with her resource parents. Figurelli opined that Gracie had "a positive affectionate attachment" to Mattie and Henry "that has been developing over time" due to their increased contact since his last evaluation the year before and had "come to recognize them as significant-other adults" in her life. But he further opined that he could not conclude Gracie "shares with them a secure emotional attachment characteristic of a fully reciprocally bonded relationship," which would have existed had Gracie come to see them as psychological parents.

A-4494-18

After observing Gracie with her resource parents, Figurelli noted she showed none of "the more immature, less developmentally consistent, more passive behavior" he had seen when she was with Matt or with Mattie and Henry. Figurelli observed the resource parents' conduct was appropriate for a parental role, as they were attentive, encouraging, and responsive, while providing redirection and limits as needed without generating significant or age-inappropriate testing. He also found the resource parents "provided [Gracie] with appropriate verbal and/or cognitive stimulation throughout" the evaluation session. The resource mother spoke to her in English and Spanish, she spoke to them "alternately in English and/or Spanish," and she understood what they said in both languages.

Figurelli concluded the quality of the interactions showed Gracie had "a secure emotional attachment" to both resource parents, and that they were her "central parental attachment figures." Her conversation with the resource parents about their sons and about "family activity" showed she continued to develop "a sense of family identity" and connectedness. Figurelli opined that Gracie was "thriving" in the care of her resource parents, and that severing that bond at this point would cause her "traumatic, severe, and enduring" harm that no other caregiver would ever be able to mitigate. Conversely, he found Gracie's

7

attachments to Matt, Mattie, and Henry were not "secure emotional parental attachments" despite their positive nature, and that the resource parents would be able to mitigate "the harm she might experience" from losing those relationships with her family. Figurelli concluded the bonding evaluations supported the permanent placement of Gracie with her resource parents.

Mattie did submit to an updated psychological evaluation by Matt's expert, Dr. Blackwell-Nehlig. Mattie reported she took her medications as prescribed, Oxycodone every four hours, Gabapentin for nerve pain every six hours, and Zanaflex for muscle spasms every six hours, but had discontinued Xanax in August 2018, because it made her drowsy and caused the occasional slurred speech that had concerned the Division. She claimed to be managing her anxiety better without the Xanax, because she was more aware of it coming on and had developed practices to shift her focus elsewhere, instead of "jumping to conclusions." Mattie also expressed a willingness to participate in the anger-management therapy recommended by the Division after the mediation, even though she did not believe she needed it. Based on her conversation with Mattie and Mattie's personal physician, who advised that Mattie's prescribed medications would not affect her ability to parent, and he had no concerns that she was misusing them, Blackwell-Nehlig concluded Mattie's anxiety was "in

8

the minimal range," and her medications would not negatively affect her ability to care for Gracie.

Addressing Mattie's many unsubstantiated reports of abuse by the resource parents, Blackwell-Nehlig testified that Mattie acknowledged the result of the Division investigations, but still wanted to understand how the injuries were occurring if Gracie's similar level of activity during visitations at her home were not causing any bruising. She opined that Mattie's repeated calls to the child abuse hotline did not reflect a psychological disorder, because the duty to report abuse arises from the possibility of abuse and not the certainty that such had occurred, and Mattie was unaware of the origin of the bruises. Blackwell-Nehlig believed the bruises in the photos the defense introduced at trial "seemed so significant" that Gracie's school would have been obligated to report them to the Division.

Mattie acknowledged to Blackwell-Nehlig that Gracie had "a connection with" the resource parents and "would allow them to stay in her life" because she had "no problem sharing" Gracie. Blackwell-Nehlig reported Mattie's only concern was for Gracie to be safe and protected and expressed her disappointment that no one else seemed troubled by the inability to identify the cause of Gracie's bruising. Mattie told Blackwell-Nehlig that no amount of

A-4494-18

distress from the Division's conduct would make her "give up" on having Gracie live with the family into which she was born and with which she was bonded.

Dr. Blackwell-Nehlig did not conduct separate bonding evaluations between Gracie and Matt, and Gracie and Mattie and Henry. Instead, she conducted the evaluation at Mattie's home with Gracie and Matt and his entire extended family. Based on her observations, Blackwell-Nehlig concluded that Mattie and Gracie had "developed a secure bond," and that Gracie had "a permanent, secure attachment" to her. Blackwell-Nehlig opined that Mattie was able to act as "a primary caregiver," and that Gracie could be placed in Mattie and Henry's custody "with no other recommended services." She concluded that Mattie would "continue to provide [Gracie] with consistent, sensitive care," and that Mattie and Henry would be able to mitigate the harm Gracie would suffer if for some reason her relationship with the resource parents were severed notwithstanding Mattie and Henry's intention to maintain it.

Blackwell-Nehlig used an interpreter for the bonding evaluation between Gracie and her resource parents and their sons, because the resource parents "speak only Spanish in their home, and they communicate with the children in Spanish," although Gracie "primarily responded in English and the boys communicated with her primarily in English." Consistent with her opinion at

10

the first trial that Gracie viewed the resource parents as her psychological parents, Blackwell-Nehlig again testified that Gracie had a "secure bond" with her resource parents and "also appeared to have an attachment" to their two sons. She testified that Gracie would suffer enduring harm from her removal from her resource parents, however, only if she "weren't allowed contact" with them in the future.

Blackwell-Nehlig had asked the resource mother as part of the evaluation whether they would permit Gracie to have contact with Matt and his extended family if the court awarded custody of Gracie to her and her husband. The resource mother had allowed that she would be open to Gracie's seeing Matt "if it would help her," but after the repeated attacks they had endured from Mattie, contact between her and Gracie "would not be possible at this time." The resource mother further explained she did not "have a good concept of the aunt" and "wouldn't know how to deal with her" once the Division was no longer involved to assist.

Blackwell-Nehlig concluded that Gracie was bonded to the resource parents and to "her biological family and she identifies them as such." She opined that the resource parents' refusal to allow Gracie contact with Matt's family "seem[ed] selfish," and made clear the resource parents didn't understand

11

that Gracie is also bonded to her biological family and "would suffer harm" if those bonds were severed. Further, although the resource parents had assured Blackwell-Nehlig of their desire to adopt Gracie, the doctor opined that their having asked the Division to remove her after the mediation "sacrificed [Gracie's] needs by creating a situation in which she would suffer harm."

Because Mattie and Henry were willing to allow continued contact between Gracie and her resource parents, which Blackwell-Nehlig opined would ameliorate any harm she would suffer from being removed from their care, she recommended that custody be awarded to them. Blackwell-Nehlig testified in accordance with her report that it was not in Gracie's best interest to remain with her resource parents "given their lack of commitment in caring for [her], as well as their insensitivity to her needs."

After hearing the testimony, Judge Velasquez issued a concise yet comprehensive written opinion terminating Susan's and Matt's parental rights to Gracie and paving the way for her adoption by the resource parents. He rejected the notion that placing Gracie with Mattie and Henry was a viable alternative, because that "plan would cause severe and enduring, and possibly irreparable harm" to the kindergartener. The judge explained he credited Dr. Figurelli's testimony about the harm that would likely befall Gracie, who suffered global

12

developmental delays owing to "static encephalopathy, an unchanging brain injury," S.R. and M.U., slip op. at 8, were she to be removed from her resource parents because it was "based in concrete observations over multiple years, made common sense within the history of the case, and because the testimony was unbiased and fair toward" Mattie and Henry.

The judge stressed that Gracie had been a part of her resource family for almost the whole of her life, and despite her many challenges had made significant progress in their care, learning to walk with leg braces after years of physical therapy and making great strides in learning to talk and express herself, in both Spanish and English, with regular speech therapy. Judge Velasquez noted that both experts agreed that Gracie had a fully-formed reciprocal bond with her resource parents, viewing them as her psychological parents. And he found credible Dr. Figurelli's opinion that the four-and-a-half-year-old would have enormous difficulty confronting the loss of those "parents" at this stage of her life, readily accepting that Gracie's "limited understanding of the world around her" would make it difficult to comprehend "why she was removed from the care of the people she understands to be her family," a harm only "exacerbated" by the child's developmental challenges.

13

Judge Velasquez was equally clear as to why he "completely discounted" Dr. Blackwell-Nehlig's opinion that Gracie's loss of her psychological parents would not cause her severe and enduring harm but only "some transitional difficulty." Besides noting that Blackwell-Nehlig "was evasive and non-responsive on cross-examination even to the most commonplace questions," and that there was no hypothetical question the lawyers for the Division and Gracie could pose that would cause her to alter her opinion, the judge found that opinion was premised on "several factual predicates" the court expressly rejected.

Specifically, the judge rejected Blackwell-Nehlig's opinion that the resource parents were not committed to Gracie, noting they continued to care for her "even after the Division lost its [termination] case." Notwithstanding the court's finding that Gracie viewed them as her psychological parents, the court's plan for Gracie was to ultimately remove her from their care "when the time was right." Judge Velasquez wrote "[t]his history illustrates a passionate commitment" to Gracie, which cannot be obliterated by the "temporary doubts" the resource parents "experienced in the summer of 2018 as to whether they could continue" to care for her in the face of Mattie's opposition. The judge found they testified "extremely credibly" they would adopt Gracie, and "for psychological parents to continue to care for a child while the Family Part enacts

14

measures to remove the child from their care amply establishe[d]" the resource parents' commitment to Gracie.

Second, the court found Mattie and Henry "would be extremely unlikely to facilitate continued contact" with the resource parents were Gracie placed in their care, and "reject[ed] any plan that relies upon contact in order to theoretically mitigate the severe and enduring harm that [Gracie] would face." Judge Velasquez noted the many witnesses who testified about "the significant delays and challenges" Gracie has had in learning to walk. She had to be fitted with braces, and as Henry testified, she "has trouble walking . . . she falls a lot." Those falls resulted in many bruises, mostly to her legs.

The judge found Matt's family "called in referrals to the DCPP Child Abuse Hotline, approximately twelve times in the past two years, and flatly reject the Division's investigation findings that [Gracie] is not being mistreated in any way in the care" of the resource parents. The judge found that "[r]egardless of whether these referrals were made in good-faith or [were] otherwise proper," those referrals and the testimony of Matt and his family that the resource parents were mistreating Gracie convinced the court they would not permit her to maintain contact with the resource parents were they to get custody of Gracie. While "not convinced" that Matt, Mattie and Henry "genuinely

believe" Gracie was being abused, despite their testimony, the judge did not find their assertions that they would facilitate contact between Gracie and the resource parents in the least credible.

Third, the judge was not convinced Mattie and Henry were even now capable of safely assuming Gracie's care, two years after the first judge dismissed the Division's guardianship complaint finding them a "viable alternative" to termination, who "could soon take over [her] care and custody." Rather than the gradual assumption of parental responsibilities the judge anticipated at the end of the first trial, she ordered Mattie's visitation supervised and eventually suspended her overnights after four reports by Division caseworkers and the CASA volunteer of Mattie slurring her speech or otherwise appearing under the influence of drugs.

And although the court had conditioned resumption of Mattie's overnights on her submission to an IME to determine the effect of her medications, and their possible misuse, on her ability to parent, Mattie had never submitted to that examination in the nine months between the order and the remand hearing "and reiterated this refusal at trial."[3] Judge Velasquez found placing Gracie, "a child

---

[3] The judge also noted Mattie and Henry's home remained unlicensed. Because such would not preclude the judge, as opposed to the Division, from placing

16

with very sensitive developmental needs," with Mattie in the face of her continued refusal to permit the Division to assess whether her very significant daily regimen of medications presented an obstacle to safely parenting the child presented "an unacceptable level of risk."

Because the judge rejected those three key factual predicates to Dr. Blackwell-Nehlig's opinion — that the resource parents were not committed to Gracie; that Matt's family would continue contact between Gracie and her resource parents if Mattie and Henry were awarded her custody; and that Mattie was capable of safely assuming Gracie's care — he found the opinion lacked any sound factual basis. Judge Velasquez accordingly concluded, based on Dr. Figurelli's more credible opinion, that Mattie and Henry were not a viable alternative, and, as that option was the only one presented by defendants, that the Division had carried its burden on the third prong by clear and convincing evidence.[4]

---

Gracie with them, see N.J. Div. of Child Prot. & Permanency v. K.N., 223 N.J. 530, 534 (2015), and the finding was not essential to the judge's decision in the matter, we do no more than note it here.

[4] In making his findings, the judge noted we found the Division had carried its burden on the second prong, that Susan was unwilling and Matt unable to eliminate the harm they'd caused Gracie, without considering whether removing her from her resource parents would cause her serious and enduring emotional

A-4494-18

Judge Velasquez also found, by clear and convincing evidence, that the Division readily established, on the strength of Dr. Figurelli's evaluations and testimony, that termination of Susan's and Matt's parental rights would not do Gracie more harm than good. The judge noted Susan did not appear on the remand. She had not been in contact with the Division for several years, has had "minimal involvement" in Gracie's life, and there was no evidence in the record of any bond between them.[5]

As to Matt, the judge found he had been as good a father to Gracie "as he could possibly be." Dr. Figurelli found him "affectionate, patient, caring and

_____

or psychological harm, N.J.S.A. 30:4C-15.1(a)(4), S.R. and M.U., slip op. at 56-59, and thus the second prong was not within the scope of the remand. The judge observed, however, that the evidence before him established the passage of almost two years' time since the first trial had only "increased the harm" that Susan and Matt have inflicted "albeit not maliciously" on Gracie, and that Dr. Figurelli had credibly testified removing Gracie from her resource parents at the time of the remand hearing would cause her severe and enduring harm that no one would be able to mitigate, thus establishing an alternative basis for our finding on prong two.

[5] Susan does not argue to the contrary on appeal but continues to try and ride the wake of whatever course Matt might set in attempting to prevent termination of his rights, contrary to established case law that "[p]arental rights are individual in nature and due process requires that fitness be evaluated on an individual basis," N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 288 (2007). See N.J. Div. of Youth & Family Servs. v. H.R., 431 N.J. Super. 212, 228 (App. Div. 2013) (holding "mother cannot rely on the father's potential claims and defenses to avoid termination of her parental rights").

A-4494-18

supportive" toward Gracie, and the court noted he had never missed a visit with her without reason and had "not missed a moment of trial." Nevertheless, neither expert believed Matt could serve as Gracie's parent, as both previously testified that Matt should never be left alone with Gracie due to his serious cognitive limitations and mental illness. S.R. and M.U., slip op. at 3. The court also took note of Dr. Figurelli's opinion that Gracie, although now viewing Matt positively, was not securely bonded to him, and its own finding that his sister Mattie and her fiancé Henry were not a viable option for her, despite that having been the court's plan for two years.

Judge Velasquez also soundly rejected Matt's family's allegations that the resource parents had mistreated Gracie. He deemed the many photos of Gracie's bruises that Matt introduced and the court admitted in evidence did not support the allegation, as most were not dated and thus could not establish which family had care of Gracie when she suffered the bruises. As already noted, the judge found Gracie "had severe mobility problems, . . . cognitive delay challenges, and has required years of physical therapy and leg braces in order to walk." The court found more persuasive and credible the testimony of the caseworkers and the CASA volunteer, none of whom had ever observed anything suggesting abuse or neglect by the resource parents. He further noted that "all concerned"

19

testified Gracie had exhibited "far less bruising in the past six months" after she had completed her physical therapy, and, as Henry testified, was "walking better now."

Judge Velasquez found the Division established that termination of Susan's and Matt's parental rights will afford Gracie the permanence her parents' inability to care for her has denied her. He was convinced by the resource parents' "perseverance in the course of this lengthy and contentious case" that they stood ready to adopt Gracie "and formalize what has long been the de facto psychological reality" for the child. The judge made his decision assuming the resource parents would not permit continued contact between Gracie and Matt's family. The court harbored no illusion that termination "would be easy" for Gracie or "that she would suffer no harm at all." He was, however, convinced the resource parents could mitigate any harm she experienced, and that the benefit of a permanent relationship with them significantly outweighed the potential harm she would suffer by severing her ties to Matt's extended family.

Defendants appeal. Matt argues there is not substantial credible evidence supporting the judge's decision to terminate parental rights "because family placement is a superior alternative to adoption in a foster home where the evidence of abuse and potential medical neglect cannot be ignored by the court

20

and Gracie has developed a bond with her aunt"; that the record supports "family placement is the proper alternative to serve Gracie's best interests"; and the Division failed to present clear and convincing evidence that termination will not do more harm than good. Susan argues that "Mattie and Henry presented a clear alternative to termination"; termination will do more harm than good because the trial court "failed to consider the undisputed fact that the unrelated foster parents will not allow any future contact between Gracie and her father Matt and her natural family"; and that the trial court "misconstrued the scope of the remand and improperly barred evidence and testimony relating to any conduct by DCPP, resulting in an incomplete and erroneous prong three analysis." The Law Guardian joins the Division in urging that we affirm the termination of both Susan's and Matt's parental rights.

Our review of the record convinces us that none of defendants' arguments is of sufficient merit to warrant discussion in a written opinion, R. 2:11-3(e)(1)(E), as all plainly devolve into a quarrel with the judge's factfinding, which they provide us no basis to disregard. As our Supreme Court has observed on countless occasions, only the trial court "has the opportunity to make first-hand credibility judgments about the witnesses who appear on the stand; it has a 'feel of the case' that can never be realized by a review of the cold record."

21

N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008) (citation omitted). We are simply not free to overturn the factual findings and legal conclusions of a trial judge "unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974) (citation omitted).

Because the trial judge's factual findings here have that support in the record, they are binding on appeal. See N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448-49 (2012) (explaining "[i]t is not our place to second-guess or substitute our judgment for that of the family court," when "the record contains substantial and credible evidence to support the decision to terminate parental rights"). Judge Velasquez meticulously explained why he "completely discounted" Dr. Blackwell-Nehlig's opinion that four-and-a-half-year-old Gracie would suffer only some "transitional difficulties" in being removed from the people she viewed as her psychological parents, who had cared for her from infancy. He also explained why he did not believe Matt's family, who had twelve times in two years reported the resource parents were physically abusing Gracie, would permit, much less encourage, the continued connection with the

A-4494-18

resource parents Blackwell-Nehlig testified was necessary to avoid severe and enduring harm to her.

The judge also detailed why he flatly rejected Blackwell-Nehlig's opinion that the resource parents were not committed to Gracie. As the law guardian who represented Gracie from the time she was removed from Susan and Matt in 2015 argued in summation on remand, what these resource parents have been through as a result of Matt's family's many unfounded allegations "is not the norm of what foster parents experience in becoming resource parents for the Division," and if it were no one would "recommend that anybody become resource parents." Based on his view of the testimony and the credibility of the witnesses, the judge rejected Matt and his family's allegations that the resource parents had ever harmed Gracie in any way,[6] and he had no reservation about their devotion to this child.

---

[6] Matt's argument that the judge failed to consider whether the bruises to Gracie documented in the photos in evidence were caused by the resource parents mistreating the child is simply inaccurate. Notwithstanding defendants' counsel's stipulation that those photographs were only being admitted for the limited purpose of demonstrating Matt's family's good faith in reporting the bruises, a stipulation defendants appear to have disregarded on appeal, the judge made clear he "would be remiss" not to consider the photographs as going to the substance of the abuse allegations. Having thoroughly reviewed the photos, the investigation reports and the testimony of the witnesses on this point, the judge found no competent evidence in the record supporting the allegations of abuse.

A-4494-18

Finally, we note, as did Judge Velasquez, that the first judge, who found Mattie and Henry a viable alternative to termination, never found the time "right" to place Gracie in their care, notwithstanding that she continued to preside over the matter for another eighteen months following the first trial. Instead she ordered Mattie's time with Gracie to be supervised and eventually suspended her overnight visits until Mattie submitted to an IME by the Division.

Tellingly, Mattie never submitted to that independent examination to consider her ability to care for Gracie in light of her pain medication regimen, reiterating her refusal to do so at trial. She also ducked an updated psychological evaluation on remand with Dr. Figurelli. That pattern is very reminiscent of Mattie's failure to do what was necessary to close out her own three-and-a-half-year case with the Division — following a suicide attempt and subsequent drug overdose — in order to permit the Division to timely consider her as a placement option for Gracie, which we discussed in our prior opinion. See S.R. and M.U., slip op. at 16-24; 70. Given those circumstances, we find no error in the trial court's finding that placing Gracie in Mattie's care presented "an unacceptable level of risk," precluding any finding on the third prong that there were alternatives to termination.

A-4494-18

In short, we are satisfied Judge Velasquez faithfully undertook the terms of the remand, and his findings that placing Gracie with Mattie and Henry was not a viable alternative to the termination of Susan's and Matt's parental rights and that termination would not do her more harm than good are amply supported by the credible evidence in the record. We, accordingly, affirm the judgments in both matters substantially for the reasons expressed in his thorough and thoughtful opinion of May 30, 2019.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-4494-18