# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3538-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

M.F.,

      Defendant-Appellant,

and

J.C.,

      Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF Z.C.,
a minor.

_____

Argued February 4, 2021 – Decided March 4, 2021

Before Judges Yannotti and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0006-20.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Joseph E. Krakora, Public Defender, attorney; Adrienne Kalosieh, on the briefs).

Meaghan M. Goulding, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Rachel B. Kristol, Deputy Attorney General, on the brief).

Melissa R. Vance, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, of counsel and on the brief).

PER CURIAM

M.F. appeals from a judgment entered by the Family Part, dated April 15, 2020, which terminated her parental rights to the minor child, Z.C.[1] We affirm.

I.

We briefly summarize the relevant facts. In October 2017, the Division of Child Protection and Permanency (Division) received a report that M.F. was abusing alcohol and marijuana. She was six months pregnant at the time. The

---

[1] We use initials to identify the parties to protect the identity of the children. R. 1:38-3(d)(12).

Division investigated the report and interviewed M.F., who was living with her brother. She denied using any drugs or alcohol during her pregnancy and stated that her paramour, J.C., was physically abusive and used drugs and alcohol. She claimed J.C. wanted her to get an abortion so that his wife would not find out about their relationship, but M.F. said she intended to keep the child. The Division's investigator noted that M.F. and her brother did not appear to be under the influence of drugs or alcohol, and that M.F. had declined services.

M.F. gave birth to Z.C. in February 2018. J.C. is the child's biological father. The child was born with Erb's palsy in her left arm because, during the birth, M.F. refused to push when the physicians told her to do so. On February 13, 2018, the Division received a referral indicating that J.C. had physically abused M.F. while she was pregnant. The referral noted concerns about J.C.'s mental health and substance abuse and stated that defendant was "cognitively delayed" and has "limited support."

Several days later, the Division received a report that M.F. was not providing for Z.C.'s basic needs. The Division's workers interviewed M.F. and J.C. They could not explain how they prepared bottles of formula for the child, and defendant admitted that she missed the child's last appointment with the Women's, Infants and Children Program because she overslept.

3

On February 19, 2018, the Division learned that the police had responded to a verbal altercation between M.F. and J.C. They agreed to a safety and protection plan, which provided, among other things, that J.C. would leave the home, the paternal grandmother would supervise M.F. and J.C.'s interactions with Z.C., and M.F. and J.C. would participate in psychological and substance abuse evaluations. The Division scheduled a conference call so that M.F. and J.C. could speak with a social worker to discuss parenting services, but M.F. and J.C. did not answer the call.

Later that month, a nurse who had been helping M.F. care for the child reported that she could no longer provide services because the paternal grandmother did not want her in the house. The nurse told the Division that the home was unkempt, and she had to instruct M.F. that she needed to pick the baby's bottles from the floor and sterilize them. The nurse said M.F. had learned some parenting skills but she "continued to require assistance."

On February 22, 2018, the Division conducted an emergency "Dodd" removal of the child, based on concerns regarding M.F.'s unaddressed mental health and substance abuse issues, and her inability to provide the child with

4

care without round-the-clock assistance.[2]  When the Division removed Z.C., she had an infected belly button and an infected wound on the back of her head. Z.C. also required physical therapy for the Erb's palsy.  The Division placed the child with resource parents, where she remained throughout the trial court proceedings.

On February 26, 2018, the Division filed a complaint in the Family Part, and the judge entered an order granting the Division's application for custody, care, and supervision of the child.  The judge ordered M.F. to complete psychological and substance abuse evaluations and participate in any recommended treatment.  The Division provided M.F. and J.C. with bus passes so that they could participate in court-ordered services.

On March 5, 2018, one of the Division's workers met with M.F. and found that M.F. had bedbugs.  M.F.'s substance abuse and psychological evaluations were postponed.  The Division alerted the resource parents of this problem, and on March 8, 2018, an exterminator found bedbugs in Z.C.'s mattress.

The court had ordered M.F. and J.C. to show cause on March 14, 2018, why the child should not remain in the custody, care and supervision of the

_____

[2]  A "Dodd" removal is an emergency removal of a child pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.  See N.J. Div. of Youth & Family Servs. v. N.S., 412 N.J. Super. 593, 609 n.2 (App. Div. 2010).

Division. M.F. and J.C. did not appear in court on the return date. The judge ordered that the child would remain in the Division's custody, care, and supervision.

The judge also ordered M.F. to complete the psychological and substance abuse evaluations and required J.C. to complete neuropsychological and substance abuse evaluations. M.F. and J.C. were granted visitation. The Division informed M.F. her services and visitation were on hold due to the problem with bedbugs.

Thereafter, the Division continued to provide services to M.F. and J.C. In May 2018, M.F. completed a substance abuse evaluation and was found to have a moderate "cannabis use disorder." M.F. admitted that she smoked marijuana fifteen days during the previous month, as well as the day before her evaluation. M.F. acknowledged that she had a history of using other drugs. She asserted that she had not consumed alcohol since the previous month.

In June 2018, M.F. completed a psychological evaluation with Elizabeth Stilwell, Psy.D. Based on the results of certain tests, Dr. Stilwell found M.F. had scored in the lower extreme range of intellectual functioning when compared to her peers. Dr. Stilwell also found that M.F. fell within the average

6

and below average range in the adaptative behavior assessment, which measures skills important for everyday living.

Dr. Stilwell noted that M.F. met the criteria for mild intellectual disability and cannabis abuse. Among other things, the doctor found that M.F.'s "clinical presentation raises significant concerns about her ability to independently care for herself let alone a small child."

Dr. Stilwell recommended that M.F. participate in "hands on" parenting skills training that reflects M.F.'s cognitive limitations. She also recommended intensive case management services, domestic violence counseling, substance abuse evaluations and treatment. She stated that M.F. should attempt to obtain stable housing and income.

In June 2018, the trial court ordered M.F. to attend a treatment program for mentally ill and chemically addicted persons. The court suspended J.C.'s visitation because he had not participated in any services. In July 2018, M.F. began a program for women who suffer from substance abuse. Around this time, M.F. moved from her brother's apartment to a YMCA shelter.

In August 2018, M.F. tested positive five times for marijuana use. She informed the Division that she was interested in obtaining her own apartment,

and she asked one of the Division's workers to speak with the case manager at the YMCA about her housing situation.

The following month, M.F. tested negative for substance abuse and her treatment was reduced to three times a week. A social worker indicated that she was assisting M.F. secure stable housing. The Division also transported M.F. to several community agencies to assist her with housing.

An agency informed M.F. that she was not eligible for services unless she had an open case with the State's Division of Developmental Disabilities (DDD). A worker assisted M.F. in completing an application for an apartment, but M.F. did not have all of the required information.

In October 2018, M.F. submitted an application for housing at an apartment complex but she was told there was a two-year waiting list. The Division referred M.F. for additional services, including therapeutic visitation, parenting and coping skills, and trauma therapy. M.F. was required to leave the YMCA shelter and she moved to a rooming house.

In November 2018, one of the Division's workers informed M.F. of the services she would have to complete for reunification with Z.C. M.F. told the worker she was feeling overwhelmed by the amount of services, and the Division recommended that she focus on substance abuse treatment.

In December 2018, the trial court conducted a permanency hearing and gave the Division a three-month extension to allow M.F. to obtain one-on-one parenting services and further substance abuse treatment. In January and February 2019, M.F. missed supervised visits with Z.C.

In March 2019, the Division learned that M.F. had missed five of twelve days of a substance abuse program she was attending, as well as most of her individual sessions with a nurse practitioner. The Division was told that if M.F. did not improve her attendance, she would be discharged from the program.

On March 27, 2019, the trial court conducted a permanency and compliance review hearing. The judge noted that M.F. had not been referred to one-on-one parenting skills and domestic violence counseling. The judge ordered M.F. to attend this service and, thereafter, she would be reevaluated by Dr. Stilwell.

The judge granted the Division another three-month extension for its permanency plan. The judge also ordered the Division to expedite all referrals for services, provide M.F. with transportation, and assist M.F. with her application to DDD for housing.

In April 2019, M.F. was again living with her brother in his apartment. The Division referred M.F. for individual therapy for parenting skills and

A-3538-19

domestic violence. When Z.C. returned to her resource home from a supervised visit with M.F., the child was found to have bedbugs. As a result, M.F.'s services were rescheduled. M.F. informed the Division that she could not continue to live with her brother, and the Division attempted to find her housing in a shelter.

In May 2019, M.F. completed a substance abuse program. She also began working with Bridgeway Rehabilitation Services (Bridgeway), an agency that provides training, counseling, and intensive case management services for persons with severe cognitive limitations.

The trial court conducted another permanency hearing on June 12, 2019. The court approved the Division's plan for termination of M.F. and J.C.'s parental rights, followed by adoption.

On August 12, 2019, the Division filed its guardianship complaint. Thereafter, the Division continued to provide M.F. with services. In the fall of 2019, Beata Sylvia Beaudoin, Ph.D. conducted a neuropsychological evaluation of M.F. as well as bonding evaluations. M.F. gave birth to another child in October 2019. She claimed she did not know she was pregnant.

In January 2020, Dr. Stilwell conducted another psychological evaluation of M.F., along with bonding evaluations. Among other things, Dr. Stilwell determined that the psychological tests confirmed that M.F. had impaired

cognitive functioning, which appeared to be organic rather than due to a transient change in mental status or substance abuse. Dr. Stilwell found that M.F.'s problems are enduring and could not be corrected with continued services. She stated that while M.F. loves her children, she is not capable of parenting independently and she will not be able to parent on her own or in the future.

Dr. Stilwell further found, based on her bonding evaluations, that Z.C. did not view M.F. as her primary attachment figure and the child viewed her resource parents as her primary attachment figures. The doctor opined that if Z.C. were removed from her resource parents, she will suffer a traumatic loss that would "produce significant and enduring harm."

Judge Mark A. Brown conducted a five-day trial on the Division's guardianship complaint. J.C. did not appear, and he was not represented by counsel. At the trial, the Division presented extensive documentary evidence, as well as testimony from caseworkers Catherine Reynolds and Modeline Mentor, Dr. Stilwell, and resource parent N.D. M.F. did not testify. Her attorney presented testimony from Dr. Beaudoin and Sharon Teague, a worker at Bridgeway. The Law Guardian did not present any witnesses.

11

On April 15, 2020, Judge Brown placed its decision on the record. The judge determined that the Division had established by clear and convincing evidence, all four prongs of the best interests test for termination of parental rights, which is codified in N.J.S.A. 30:4C-15.1(a). Judge Brown memorialized his decision in a judgment dated April 15, 2020, which terminated M.F. and J.C.'s parental rights to Z.C. This appeal followed.[3]

II.

We note initially that the scope of our review of a trial court's order terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)). Reviewing courts should uphold the trial court's factual findings when they are "supported by adequate, substantial, and credible evidence." Ibid. (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Deference to the trial court's findings of fact is especially appropriate "when the evidence is largely testimonial and involves questions of credibility." Cesare v. Cesare, 154 N.J. 394, 412 (1998) (quoting In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997)). Moreover, appellate courts afford deference

---

[3] J.C. has not appealed from the trial court's order.

to the factual findings of the Family Part's judges because that court has "special jurisdiction and expertise in family matters, . . . ." Id. at 413.

Pursuant to its "parens patriae responsibility, the State may terminate parental rights if the child is at risk of serious physical or emotional harm or when necessary to protect the child's best interests." R.G., 217 N.J. at 553-54 (citing N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 599 (1986)). The best interests standard, which was established in A.W. and thereafter codified at N.J.S.A. 30:4C-15.1(a), "aims to achieve the appropriate balance between parental rights and the State's parens patriae responsibility." Id. at 554 (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 280 (2007)).

Parental rights may be terminated pursuant to N.J.S.A. 30:4C-15.1(a) when:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The four elements "are not discrete and separate; they overlap to offer a full picture of the child's best interests." R.G., 217 N.J. at 554 (citing M.M., 189 N.J. at 280). The Division bears the burden to prove all four statutory criteria by clear and convincing evidence. Ibid.

### III.

On appeal, M.F. argues that the trial court erred by finding that the Division established prong three under N.J.S.A. 30:4C-15.1(a). She contends the Division failed to show that it made reasonable efforts to correct the circumstances that led to Z.C.'s placement outside the home. We disagree.

Prong three "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into [resource] care." K.H.O., 161 N.J. at 354 (citing In re Guardianship of D.M.H., 161 N.J. 365, 393 (1999)). While assisting a parent's attempts to achieve reunification of the

family is "both a central and paramount consideration in determining" the reasonableness of the Division's efforts, a lack of success does not foreclose a finding that the Division met its burden. D.M.H., 161 N.J. at 389-93.

M.F. asserts that the Division "defied Dr. Stilwell's recommendations" and provided her with "cookie-cutter services." She contends the Division's delay in providing one-on-one parenting services and therapeutic visitation hindered the trial court's ability to assess whether she was capable of parenting the child. She further argues that the Division erroneously prioritized treatment for her substance abuse over her housing needs, which she claims was the "lynchpin" of the services she needed for stability and reunification with the child.

In his decision, Judge Brown noted that the Division had provided M.F. a "multitude of services." The judge pointed out that the services included psychological, neurophysiological, and psychiatric evaluations; group and individual therapy; substance abuse evaluations; domestic violence treatment; parenting classes; supervised visits; therapeutic visits; bus passes and transportation to the Division's offices; housing and other forms of assistance.

The judge noted that in her first evaluation, Dr. Stilwell expressed significant concerns about M.F.'s ability to care for herself and the child. She had recommended intensive case management and supervised visits with hands-

on parenting skills training due to M.F.'s cognitive limitations. M.F. completed a parenting skills program in February 2018, but it was not suited to her needs.

The judge observed that there was a significant delay in getting M.F. into a suitable parenting skills program, and Dr. Stilwell found that while M.F. had made some progress in the program with Dr. Smith, she still had concerns as to whether M.F. could use the skills learned in the sessions.

Dr. Stilwell found that M.F. would require assistance with parenting skills at every stage of Z.C.'s development, and the services would have to increase significantly in an unsupervised setting because M.F. was not capable to parenting the child independently. Dr. Stillwell opined that M.F. would require a co-parent twenty-four hours a day, seven days a week.

The judge also noted that Dr. Stilwell had testified that earlier implementation of one-on-one parenting skills training would have been helpful because M.F. would have been further along in the improvement of her parenting abilities and her efforts to obtain housing. However, Dr. Stilwell had also testified that M.F. could not progress to the point where she could parent the child independently.

The judge observed that Dr. Beaudoin had testified that M.F.'s ability to parent would improve if she continued to receive services for twelve to eighteen

16

months. Dr. Beaudoin was, however, unable to conclude that M.F. would be able to independently parent a child at the completion of those services. The judge pointed out that while M.F. had been able to find a place to stay in a rooming house, and while she had completed an application for services through DDD, there was no certainty she would be able to find suitable housing.

Judge Brown found that, although the Division had delayed in the implementation of the services recommended for M.F.,

> the Division did indeed make reasonable efforts to provide services to help [M.F.] correct the circumstances which led to [Z.C.'s] placement outside the home. The services were appropriate and could certainly have been provided in a more timely fashion, but the overriding issue is the inability of [M.F.] to overcome her own limitations despite the efforts made by the Division. And, [M.F.] was found not to be able to do so due to her cognitive limitations, which [cannot] be addressed through therapy or medication as determined by Dr. [Stilwell].

We are convinced there is sufficient credible evidence in the record to support the judge's findings that the Division established prong three under N.J.S.A. 30:4C-15.1(a) with clear and convincing evidence. The record supports the judge's finding that the Division made reasonable efforts to address the reasons for the child's removal from M.F.'s custody.

We reject M.F.'s contention that the Division did not provide her with services suitable to her needs. Like the trial judge, we recognize that the Division delayed in providing M.F. with the one-on-one parenting skills training that had been recommended. However, as Dr. Stilwell testified, because of her cognitive limitations, it was unlikely that M.F. would have been able to independently parent Z.C. even had those services been provided earlier.

We also reject M.F.'s contention that the Division erroneously prioritized her need for substance abuse services over her need for suitable housing. The Division reasonably determined that substance abuse treatment was an important step in addressing the circumstances for the child's removal, and the Division did not neglect M.F.'s housing needs.

Indeed, the record shows that the Division assisted M.F. in her search for suitable housing. As the Division explained, it is not a housing agency. Even so, the Division helped M.F. with her housing applications, and placed her in touch with Bridgeway, which was able to find M.F. housing in a rooming house and provided her with assistance in seeking housing services from DDD.

We have considered M.F.'s other arguments regarding prong three and conclude these arguments lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

18

IV.

M.F. further argues that the Division failed to meet its burden under prongs one and two of N.J.S.A. 30:4C-15.1(a) because the Division failed to make reasonable efforts to address the reasons for the child's removal, which precluded the court from making an assessment as to whether she was able to eliminate the harm to Z.C. Again, we disagree.

The first prong of N.J.S.A. 30:4C-15.1(a), requires the Division to establish "that the health, safety, and development of a child has been or would continue to be endangered if a relationship with the parents was allowed to continue." N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 380 (App. Div. 2018) (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)). "[A] parent's inability to provide care is harmful and can endanger the health of a child." Ibid. (quoting K.H.O., 161 N.J. at 346).

The second prong of N.J.S.A. 30:4C-15.1(a) relates to parental unfitness and may be established in several ways. K.H.O., 161 N.J. at 352. The Division may show that the parent is "'unwilling or unable to eliminate the harm' that has endangered the child's health and development." Id. at 352 (quoting N.J.S.A. 30:4C-15.1(a)(2)). "Parental unfitness may also be demonstrated if the parent has failed to provide a 'safe and stable home for the child' and a 'delay in permanent placement' will further harm the child." Ibid.

In his decision, Judge Brown noted that both Dr. Stilwell and Dr. Beaudoin had testified that at the time of trial, M.F. was not capable of parenting Z.C. independently. Dr. Beaudoin acknowledged that M.F. was in the low range of "independent skills and needed help." The judge pointed out the Dr. Beaudoin had suggested that M.F. receive case management and one-on-one training with Dr. Smith for twelve to eighteen additional months, after which she would be reassessed to see if unsupervised visits would be appropriate.

The judge also noted the Dr. Stilwell had testified that additional services would not alter the outcome. Dr. Stilwell opined that because of her cognitive deficits, M.F. will not be able to ever parent the child independently and her lack of available support would exacerbate the problem.

We conclude there is sufficient credible evidence in the record to support Judge Brown's finding that the Division established prongs one and two under N.J.S.A. 30:4C-15.1(a). The record supports the judge's findings that Z.C.'s health, safety, and development have been harmed by her relationship with M.F. The record also shows that due to her cognitive deficits, M.F. is unable to eliminate the harm.

Indeed, the record shows that, although the Division had provided M.F. with an array of services, she was not capable of parenting the child

independently and could not provide the child with a safe and stable home. Moreover, the expert testimony showed that she would not be capable of doing so within the foreseeable future, even with the provision of additional services, and a delay in a permanent placement would cause the child to suffer further harm.

Accordingly, we reject M.F.'s contention that the Division failed to establish prongs one and two of N.J.S.A. 30:4C-15.1(a).

V.

M.F. also contends that the record does not support the trial court's finding that the Division had established that termination of her parental rights will not do more harm than good, as required by prong four of N.J.S.A. 30:4C-15.1(a). M.F.'s argument is without merit.

Prong four of the best interests standard "requires the court to determine whether the best interests of the child would be served by the termination of parental rights." T.D., 454 N.J. Super. at 380-81 (citing E.P., 196 N.J. at 108). Because there is always risk associated with the termination of parental rights,

> the fourth prong . . . cannot require a showing that no harm will befall the child as a result of the severing of biological ties. The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents

21

A-3538-19

than from the permanent disruption of her relationship with her [resource] parents.

[K.H.O., 161 N.J. at 355.]

The essential element in evaluating the fourth prong is "the child's need for a permanent and stable home, along with a defined parent-child relationship." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 226 (App. Div. 2013) (citing N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div.), certif. denied, 180 N.J. 456 (2004)). "Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law." N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001).

In his decision, Judge Brown noted that Dr. Beaudoin had acknowledged that M.F. was in the low range of adaptive functioning and required home assistance on a one-on-one basis twenty-four hours a day, seven days a week. Dr. Beaudoin had suggested that M.F. receive services for an additional twelve to eighteen months, when M.F. would be reassessed to determine if unsupervised visits were appropriate.

The judge also noted that Dr. Stilwell had testified that providing such additional services would not alter the outcome, and that due to her cognitive limitations, M.F. would not be able to parent the child independently. The judge

22

recognized Dr. Beaudoin's expertise, but found that she had based her opinion on M.F.'s interest in reunification with the child rather than the child's best interests.

Judge Brown found that the "reality" is that M.F. is unable to parent the child independently and will require round-the-clock parenting assistance every day of the week. The judge noted that Z.C. had formed secure bonds with her resource parents, who she sees as parental figures.

The judge found this attachment will only become stronger over time. The judge stated that the child will "suffer enduring harm" if this bond is severed, and M.F. could not mitigate the harm. The judge concluded that the Division had established prong four with clear and convincing evident.

We are convinced there is sufficient credible evidence in the record to support the judge's finding on prong four. The judge accepted Dr. Stilwell's testimony in concluding that Z.C.'s best interests would be served by termination of M.F.'s parental rights. As the judge found, the evidence clearly and convincingly established that termination of M.F.'s parental rights will not do more harm than good.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3538-19