67 A.3d 689

NEW JERSEY DIVISION OF YOUTH AND FAMILY SERVICES,[1] PLAINTIFF–RESPONDENT, v. H.R. AND N.B., DEFENDANTS–APPELLANTS.

IN THE MATTER OF THE GUARDIANSHIP OF E.B., A MINOR.

Superior Court of New Jersey
Appellate Division

Submitted May 6, 2013—Decided June 10, 2013.

---

[1] L. 2012, c. 16, eff. June 29, 2012, reorganized the Department of Children and Families and renamed the Division of Youth and Family Services (DYFS) as the Division of Child Protection and Permanency. We will continue to use the designation DYFS in this opinion.

Before Judges ASHRAFI, ESPINOSA and GUADAGNO.

*Joseph E. Krakora,* Public Defender, attorney for appellant H.R. (*Richard Sparaco,* Designated Counsel, on the brief).

*Joseph E. Krakora,* Public Defender, attorney for appellant N.B. (*Thomas Hand,* Designated Counsel, on the brief).

*Jeffrey S. Chiesa,* Attorney General, attorney for respondent (*Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Elizabeth S. Sherwood,* Deputy Attorney General, on the brief).

*Joseph E. Krakora,* Public Defender, Law Guardian, attorney for minor (*Katherine J. Bierwas,* Designated Counsel, on the brief).

The opinion of the court was delivered by

ASHRAFI, J.A.D.

Defendants H.R. (the mother) and N.B. (the father) appeal from the judgment of the Chancery Division, Family Part, terminating their parental rights to their daughter, now six years old. Both defendants challenge the sufficiency of evidence to meet all four subparts of *N.J.S.A.* 30:4C–15.1(a) for termination of parental rights.

We consolidated their appeals and have reviewed the record. The Family Part had sufficient evidence to support its findings and conclusions as to most of the requirements of the statute, but an error occurred during the proceedings that warrants clarification by the court and further consideration by the caretaker parents of a potential alternative to adoption. DYFS gave legally incorrect information to the prospective adoptive mother, the child's maternal aunt, about the potential option of kinship legal guardianship instead of adoption of the child. The Family Part must correct the error and determine whether the caretaker parents still wish to adopt the child rather than agree to kinship legal guardianship. We reverse and remand for the Family Part to conduct a hearing and to make that determination.

Defendants' daughter was born in the summer of 2006. She was removed from their custody in October 2009 because defendants are drug addicts who endangered the safety of their child and did not provide a stable home for her. Over the next two years, defendants failed to treat their drug addiction or to provide a secure, nurturing home for their child. Despite the supervision and guidance of DYFS, they demonstrated virtually no willingness or ability to eliminate the risk of harm to the child.

A few months before the Family Part held a guardianship trial in October 2011, the father began to show some signs of improvement and a legitimate interest in establishing a healthier parental relationship. The mother never improved and gave no indication that she would. She did not attend the guardianship trial, although she was represented at the trial by designated counsel. The mother stopped seeing the child months earlier, and her whereabouts were unknown at the time of the trial.

The child has been under the care of her maternal aunt since May 2010 and has an opportunity now for permanent placement and stability. Were it not for the incorrect information that DYFS imparted to the aunt, we would not question the Family Part's decision that the best interests of the child require termination of defendants' parental rights so that the child can be

adopted. However, because DYFS misled the aunt about kinship legal guardianship, and because the aunt favors a continuing relationship between the child and at least the child's father, provided he is "clean," the evidence is insufficient to conclude that no alternative to termination of parental rights is available that will serve the child's best interests.

The applicable statute, *N.J.S.A.* 30:4C–15.1(a), provides that parental rights may be terminated when:

(1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;

(2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide for a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) [DYFS] has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

The four subparts of the statute are "not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." *In re Guardianship of K.H.O.*, 161 *N.J.* 337, 348, 736 *A.*2d 1246 (1999). The Family Part's inquiry is extremely fact-sensitive. *N.J. Div. of Youth & Family Servs. v. M.M.*, 189 *N.J.* 261, 280, 914 *A.*2d 1265 (2007). DYFS bears the burden of proving all four statutory criteria by clear and convincing evidence. *N.J. Div. of Youth & Family Servs. v. G.L.*, 191 *N.J.* 596, 606, 926 *A.*2d 320 (2007).

As an appellate court, we do not weigh the evidence as if we must make an initial decision. We defer to the trial court's findings of fact and the conclusions of law that are based on those findings. *Id.* at 605, 926 *A.*2d 320; *N.J. Div. of Youth & Family Servs. v. A.R.*, 405 *N.J.Super.* 418, 433, 965 *A.*2d 174 (App.Div. 2009). We accord deference to the trial judge because she had the opportunity to "make first-hand credibility judgments" and to gain a "feel of the case" over time, thus supporting a level of factual familiarity that cannot be duplicated by an appellate court review-

ing a written record. *N.J. Div. of Youth & Family Servs. v. E.P.*, 196 *N.J.* 88, 104, 952 *A.*2d 436 (2008) (quoting *M.M., supra,* 189 *N.J.* at 293, 914 *A.*2d 1265). We also defer to the trial court's assessment of expert evaluations. *In re Guardianship of D.M.H.*, 161 *N.J.* 365, 382, 736 *A.*2d 1261 (1999).

In *E.P., supra,* 196 *N.J.* at 104, 952 *A.*2d 436, the Supreme Court said: "We will not disturb the family court's decision to terminate parental rights when there is substantial credible evidence in the record to support the court's findings." *Accord In re Guardianship of J.N.H.*, 172 *N.J.* 440, 472, 799 *A.*2d 518 (2002). "Only when the trial court's conclusions are so 'clearly mistaken' or 'wide of the mark' should an appellate court intervene and make its own findings to ensure that there is not a denial of justice." *E.P., supra,* 196 *N.J.* at 104, 952 *A.*2d 436 (quoting *G.L., supra,* 191 *N.J.* at 605, 926 *A.*2d 320). Here, the family court's conclusions were not wide of the mark, and we do not make our own findings. Rather, our task is to assure that the statute was applied correctly in all respects.

Defendants contend the judgment should be reversed because the evidence did not satisfy any of the four criteria of *N.J.S.A.* 30:4C–15.1(a). With respect to the first criterion, they assert the child was never harmed physically and that DYFS presented no evidence of psychological harm.

To establish the first subpart of the statute, DYFS "must prove harm that 'threatens the child's health and will likely have continuing deleterious effects on the child.'" *N.J. Dep't of Children & Families v. A.L.,* 213 *N.J.* 1, 25, 59 *A.*3d 576 (2013) (quoting *K.H.O., supra,* 161 *N.J.* at 352, 736 *A.*2d 1246). "[T]he best interests standard does not concentrate on a single or isolated harm or past harm as such.... [T]he focus is on the effect of harms arising from the parent-child relationship over time on the child's health and development." *K.H.O., supra,* 161 *N.J.* at 348, 736 *A.*2d 1246 (citing *N.J. Div. of Youth & Family Servs. v. A.W.,* 103 *N.J.* 591, 604–10, 512 *A.*2d 438 (1986)). Although drug use alone is not enough to show harm, "guardianship cases ... often

address long-term problems that affect a child's welfare." *A.L.*, *supra*, 213 *N.J.* at 24–25, 59 *A.*3d 576.

The first statutory subpart addresses the risk of future harm to the child as well as past physical and psychological harm. DYFS "need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." *D.M.H., supra*, 161 *N.J.* at 383, 736 *A.*2d 1261. Here, harm and risk of harm were proven because the parents' drug use resulted in their failure to provide a stable home, with appropriate nurture and care of the young child, and because they had a history of criminal arrests and incarcerations that created a serious risk of emotional long-term harm of the child. *See id.* at 379, 736 *A.*2d 1261; *A.W., supra*, 103 *N.J.* at 605, 512 *A.*2d 438; *see also N.J. Div. of Youth & Family Servs. v. A.G.*, 344 *N.J.Super.* 418, 440, 782 *A.*2d 458 (App.Div.2001), *certif. denied*, 171 *N.J.* 44, 791 *A.*2d 222 (2002) (the potential for serious psychological damage is a harm under the statute).

The child was removed from defendants in October 2009 after the mother was involved in a motor vehicle accident while she was driving under the influence of heroin with the child in the car. The mother had taken the car without permission and then caused a collision, and the child's maternal grandmother notified DYFS. When DYFS investigated, it found not only that the mother was using heroin daily but that the father was also in possession of used hypodermic needles. Both had needle tracks on their arms as evidence of intravenous heroin use. At a later time, both admitted consuming up to twenty bags of heroin per day.

In the months after the child was removed, defendants resisted drug screens or used subterfuges to skew the results. Nevertheless, DYFS confirmed through drug testing and other evidence that defendants continued to use drugs, including, by one or both, heroin, cocaine, marijuana, alcohol, prescription medications, derivatives of illegal drugs, and crystal methamphetamine.

DYFS learned that both mother and father had been arrested and incarcerated in the past for their possession of illegal drugs and for burglaries or other kinds of thefts committed to support their drug habits. After DYFS became involved, neither parent was able to avoid yet another arrest for drug or theft offenses. In March 2010, both defendants stipulated for purposes of the family court proceedings that they were addicted to drugs and that they had placed their daughter in danger.

Over the months that followed, defendants showed no ability or inclination to overcome their addiction and to provide a safe, secure home for their child. Defendants were asked to leave the residences they occupied because the homeowners found drug paraphernalia in their room, or they stole prescription drugs or miscellaneous valuables from the home. Left without local relatives or acquaintances who would provide a residence for them, they moved to Pennsylvania in August 2010, but they were eventually compelled to leave that home as well. They then separated, and the father moved to Ohio in March 2011 to live with his mother and step-father. During the time after the child's removal, the focus of both parents was on obtaining the drugs they needed rather than on rehabilitating themselves and creating a reliable home environment so that their daughter would be returned to them.

This was not a case where DYFS or the court viewed drug use in isolation as harming the child. The risk of harm was proven by the entrenched severity of the parents' drug addiction, the negative effect it had on their lives, and the instability of the child's home.

When the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions, and the parent is unwilling or incapable of obtaining appropriate treatment for that condition, the first subpart of the statute has been proven. *Cf. N.J. Div. of Youth & Family Servs. v. F.M.*, 211 *N.J.* 420, 450–51, 48 *A.*3d 1075 (2012) (failure to treat mental illness). The evidence supports the Family Part's conclu-

sion that DYFS proved the first subpart by the clear and convincing standard of proof.

We also find no merit in defendants' arguments that the second subpart of the statute was not proven. DYFS can prove this subpart by demonstrating that the parent has not cured the problems that led to removal of the child. *K.H.O., supra,* 161 *N.J.* at 348–49, 736 *A.*2d 1246. Or, DYFS can show that the parent cannot provide a safe and stable home, which inability will prevent the child from having a sense of permanency or will add to the harm. *Ibid.* Here, the family court concluded that neither defendant had eliminated the risk of harm to the child and neither could provide a safe, stable home.

At the time of the guardianship trial in October 2011, the mother had been absent from her daughter's life for several months. She had not seen or contacted the child since May 2011, when she canceled a Mother's Day visit. She continued to use drugs. She had not successfully completed any treatment, rehabilitation, or therapy program with any lasting positive effects. She committed criminal acts besides her illegal drug use. She was arrested again and charged in August 2011, shortly before the guardianship trial. Her whereabouts were unknown at the time of trial. The maternal aunt had no confidence that her sister would improve. Through her conduct, defendant mother demonstrated an unwillingness and an inability to be a parent to the child.

As to the father, he had not shown a continuing commitment to his daughter over a sustained period of time, and his self-proclaimed sobriety at the time of trial was a recent and inadequately proven transformation. In the two years from the child's removal until the guardianship trial, the father had enrolled in programs, but he routinely failed to complete them with positive results. He refused drug testing or conducted himself in a manner during urine screens that caused suspicion about their validity. He later admitted at the trial that he continued to use drugs illegally until April 2011.

He moved to Ohio after he was evicted from his Pennsylvania residence for stealing valium from other residents. In Ohio, he was living with his mother and step-father and maintained employment. He declared he had been "sober" for six months and was attending AA/NA meetings, but he did not have a sponsor and he was not enrolled in any drug treatment and rehabilitation program. He had one recent drug screen, in August 2011, and the result showed no use of illegal drugs. His plans to take the child back to Ohio were thoughtful, but tenuous because of his history of relapse and the inability of DYFS to supervise the reunification. Even his own psychologist expert at the trial, Barry Katz, Ph.D., did not believe the father was ready to care for his child at the time of the trial. Katz testified that the father might potentially become capable in the future and he should be re-evaluated in six months.

DYFS's expert psychologist, Elizabeth Smith, Psy.D., concluded that the father's history of drug abuse indicated a probability that he would relapse, as he had in the past after periods of sobriety. The father's sobriety was of short duration, and it was not entitled to great weight.

The family court concluded appropriately that neither parent had shown the ability or willingness to eliminate the risk of harm to the child. The second subpart of the statute was proven by clear and convincing evidence.

With respect to the third subpart, DYFS acted reasonably in providing services to defendants that included psychiatric and psychological evaluations, substance abuse evaluations and treatment, psychological therapy, and supervised visitation with the child. Furthermore, DYFS continued to provide guidance and services after defendants were compelled to move out of New Jersey. DYFS provided transportation expenses for the father to travel from Ohio to New Jersey every month to visit with his daughter. Despite these efforts, neither defendant showed an inclination or ability to benefit from all the services provided.

As part of its analysis of the third prong, the court is required to consider alternatives to the termination of parental rights. *N.J.S.A.* 30:4C–15.1(a); *N.J. Div. of Youth & Family Servs. v. K.L.W.*, 419 *N.J.Super.* 568, 580, 18 *A.*3d 193 (App.Div.2011). When a child is removed from the parents' home, DYFS must assess whether relatives of the child can provide care and a home. *N.J.S.A.* 30:4C–12.1; *K.L.W., supra,* 419 *N.J.Super.* at 580, 18 *A.*3d 193. Here, DYFS placed the child with relatives, at first with an uncle and later with the mother's sister and her husband. The child has benefited from a stable, loving home with her maternal aunt and her husband since May 2010.

As part of their argument with respect to the third subpart of the statute, defendants contend the family court erred in failing to examine kinship legal guardianship as an alternative to termination of their parental rights. Although the family court considered that alternative, its review was based on inaccurate advice given to the caretaker mother, which was never adequately corrected.

 Before addressing that error in the trial, we skip ahead to the fourth subpart of the statute, that termination of parental rights will not do more harm than good. We find no fault with the family court's findings and conclusions regarding that statutory requirement.

 The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child relationship. *N.J. Div. of Youth & Family Servs. v. C.S.*, 367 *N.J.Super.* 76, 119, 842 *A.*2d 215 (App.Div.), *certif. denied,* 180 *N.J.* 456, 852 *A.*2d 192 (2004). When a bond exists between the child and the caretaker parent, and the biological parents cannot correct their poor conduct, the termination of their parental rights will not do more harm than good. *E.P., supra,* 196 *N.J.* at 108, 952 *A.*2d 436. If the separation of the child from the caretaking parents will cause serious harm, then the fourth subpart is fulfilled. *Ibid.* The court can rely on expert testimony to make the relevant determination. *J.C., supra,* 129 *N.J.* at 19, 608

*A*.2d 1312. Overall, the court's focus should be on the child's need for permanency. *M.M., supra*, 189 *N.J.* at 281, 914 *A*.2d 1265.

The father contends he and the child shared a strong bond, that the child wanted to be reunited with him,[2] and that she will suffer if his parental rights are terminated. The father had two years to complete services and adopt a drug-free lifestyle. In that time, he did not demonstrate a reliable commitment to sobriety and the needs of the child. Neither expert who testified disputed that the child had a bond with her father, but psychologist Smith believed the child held an idealized perception of her father that did not coincide with the reality of their relationship. Smith cautioned that the father was at high risk for a drug relapse, and that the child could suffer damage to her mental health if he relapsed. Defense expert Katz also conceded that a failed reunification with the father would cause trauma to the child.

The child shared a secure and comfortable bond with her caretaking parents, who were open to having the father visit with his daughter, provided that he was not using drugs. The Supreme Court has observed that a caretaking parent's allowing visitation was a positive factor in holding that the fourth subpart of the best interests test was satisfied. *M.M., supra*, 189 *N.J.* at 288, 914 *A*.2d 1265.

In the end, the child's need for a permanent placement takes precedence over the father's struggle with sobriety. He has been given enough time to show a likelihood of overcoming his addiction. The child should not "languish indefinitely in foster care while a birth parent attempts to correct the conditions that resulted in an out-of-home placement." *N.J. Div. of Youth & Family Servs. v. S.F.*, 392 *N.J.Super.* 201, 209, 920 *A*.2d 652 (App.Div.), *certif. denied*, 192 *N.J.* 293, 927 *A*.2d 1292 (2007). The father is not entitled to yet additional time.

---

[2] Contrary to the father's assertion, defense expert Katz testified that the child said there was no place she wanted to live other than the home of her caretaker parents.

 Attempting a piggy-back argument, the mother contends that her rights should not have been terminated because the father's rights should not have been terminated. This argument fails because "[p]arental rights are individual in nature and due process requires that fitness be evaluated on an individual basis." *M.M., supra,* 189 *N.J.* at 288, 914 *A.*2d 1265; *see also N.J. Div. of Youth & Family Servs. v. F.M.,* 375 *N.J.Super.* 235, 259, 867 *A.*2d 499 (App.Div.2005) (evidence supporting termination of parental rights must be viewed individually as to each parent). The mother cannot rely on the father's potential claims and defenses to avoid termination of her parental rights.

Furthermore, we reject the mother's claim that she should have been given more time to re-engage in therapy and to achieve reunification with her child. The mother continued to abuse drugs, did not have a job, did not have a stable residence, had not complied with services, failed to visit the child regularly, ceased visitation, did not attend psychological or bonding evaluations with Dr. Smith, and did not attend the guardianship trial. We reject the mother's arguments that DYFS failed to prove by clear and convincing evidence that termination of her parental rights would not do more harm than good.

We find no reason to disturb the Family Part's findings as to the fourth subpart of the statute.

 Returning to the need to consider alternatives to termination of parental rights and adoption, the father contends that DYFS has a policy against implementing a permanency plan of kinship legal guardianship if the child is less than twelve years old and that the policy is arbitrary and capricious and violates the separation of powers doctrine of the New Jersey Constitution.

Although DYFS did not admit it had such a policy, a DYFS caseworker testified that she told the maternal aunt kinship legal guardianship was not available for a child less than twelve years old. But the Kinship Legal Guardianship Act, *N.J.S.A.* 3B:12A–1 to –7, has no such restriction. The relevant provisions of the Act

authorize the family court to appoint a kinship legal guardian for a child if the following elements are proven by clear and convincing evidence:

(1) each parent's incapacity is of such a serious nature as to demonstrate that the parents are unable, unavailable or unwilling to perform the regular and expected functions of care and support of the child;

(2) the parents' inability to perform those functions is unlikely to change in the foreseeable future;

(3) ... (a) [DYFS] exercised reasonable efforts to reunify the child with the birth parents and these reunification efforts have proven unsuccessful or unnecessary; and (b) adoption of the child is neither feasible nor likely; and

(4) awarding kinship legal guardianship is in the child's best interests.

[*N.J.S.A.* 3B:12A–6(d).]

Nothing in the Act states that a young child does not qualify.

The courts have previously accepted kinship legal guardianship arrangements with children under the age of twelve. *See N.J. Div. of Youth & Family Servs. v. L.L.,* 201 *N.J.* 210, 214, 989 *A.*2d 829 (2010) (affirming the placement of a four-year-old child with her aunt by kinship legal guardianship); *N.J. Div. of Youth & Family Servs. v. D.H.,* 398 *N.J.Super.* 333, 335, 343, 942 *A.*2d 41 (App.Div.2008) (reversing the Family Part's approval of a permanency plan for a five-year-old child that rejected kinship legal guardianship by her grandmother based on the child's age); *S.F., supra,* 392 *N.J.Super.* at 203, 920 *A.*2d 652 (affirming kinship legal guardianship for a three-year-old and a four-year-old with their grandparents).

 Kinship legal guardianship permits a caretaker to become the legal guardian of a child until the age of majority without the biological parent permanently losing his or her parental rights. *N.J. Div. of Youth & Family Servs. v. P.P.,* 180 *N.J.* 494, 508, 852 *A.*2d 1093 (2004). It may be suited to circumstances where the biological parent may yet become fit to care for the child and the caretaking parent is willing to abide that time while taking full responsibility for care of the child. However, the caretaking parent must be made aware that the statute does not provide permanency and protection against future court proceedings in the same way as adoption. The biological parent may seek to regain

custody or to reinstate other kinds of involvement in the child's life, such as visitation. *Id.* at 508–10, 852 *A.2d* 1093. A kinship legal guardian does not have the same assurances of permanent control over the child's well-being as does an adoptive parent.[3]

Under the specific language of the statute, *N.J.S.A.* 3B:12A–6(d)(3), and because of the child's interest in permanency, kinship legal guardianship is only a viable option when adoption is not feasible or likely. *P.P., supra,* 180 *N.J.* at 509, 852 *A.2d* 1093; *accord D.H., supra,* 398 *N.J.Super.* at 339–41, 942 *A.2d* 41; *S.F., supra,* 392 *N.J.Super.* at 213, 920 *A.2d* 652. Here, the maternal aunt testified that she and her husband want to adopt the child. When a caretaker "unequivocally" asserts a desire to adopt, the

---

[3] Subsection (a) of *N.J.S.A.* 3B:12A–4, which is entitled "Rights, responsibilities, authority of kinship legal guardian," states:

a. (1) Except as provided in paragraph (2) of this subsection, a kinship legal guardian shall have the same rights, responsibilities and authority relating to the child as a birth parent, including, but not limited to: making decisions concerning the child's care and well-being; consenting to routine and emergency medical and mental health needs; arranging and consenting to educational plans for the child; applying for financial assistance and social services for which the child is eligible; applying for a motor vehicle operator's license; applying for admission to college; responsibility for activities necessary to ensure the child's safety, permanency and well-being; and ensuring the maintenance and protection of the child.

(2) A kinship legal guardian may not consent to the adoption of the child or a name change for the child. The birth parent of the child shall retain the authority to consent to the adoption of the child or a name change for the child.

(3) The birth parent of the child shall retain the obligation to pay child support.

(4) The birth parent of the child shall retain the right to visitation or parenting time with the child, as determined by the court.

(5) The appointment of a kinship legal guardian does not limit or terminate any rights or benefits derived from the child's parents, including, but not limited to, those relating to inheritance or eligibility for benefits or insurance.

(6) Kinship legal guardianship terminates when the child reaches 18 years of age or when the child is no longer continuously enrolled in a secondary education program, whichever event occurs later, or when kinship legal guardianship is otherwise terminated.

statutory requirement that adoption is neither feasible nor likely is not satisfied. *N.J. Div. of Youth & Family Servs. v. T.I.*, 423 *N.J.Super.* 127, 130, 30 *A.*3d 1074 (App.Div.2011).

Defendants contend, however, that the court did not consider the full testimony of the maternal aunt, and that she was forced to testify she preferred adoption by DYFS's threat to remove the child from her home if she did not opt for adoption.

During direct examination, the maternal aunt testified:

Q: What is your position today about adopting [the child] if reunification does not occur?

A: There's—I will adopt her with no problem. It shouldn't really even need to be asked.

She confirmed that her husband also shared her commitment to adoption. At the same time, she explained that she intended to control but not to prohibit permanently contact between the child and defendants.

A: With her mother, my sister, as it stands right now until my sister gets help [the child] will not be having contact with her. If [the father] continues to do well—my one rule always was that if you're clean you're welcome. If [the father] continues to do well and continues to improve and maintain his health and his sobriety I have no problem with having [the father] in my house around his daughter. He's part of the family too.

During her evaluation by Dr. Katz, the caretaker mother had described the arrangement she envisioned as similar to the visitation rights of a divorced father. On cross-examination at the guardianship trial, she expressed her discomfort with the notion of parental rights being permanently terminated, even with respect to her sister, whom she would not allow in the child's life at the present time. She believed termination to be a drastic step and was willing to assist DYFS's plan for termination and adoption primarily because she believed the child needed a stable home.

She was asked about her knowledge of kinship legal guardianship as an alternative to adoption. She said she had attended a foster parenting class and that:

A: My understanding is that a child has to be 12 or older ... in order for that to actually be effective or available. Because they're—they're too old—they're old enough to, kind of, make a decision. But they're not old enough. It's—I don't

know. I understood it to be just that I have custody. But he wouldn't lose his rights. That's my understanding of the whole thing.

She testified that the DYFS caseworker had told her a child had to be at least twelve years old. Defense counsel's attempts to correct that misapprehension were thwarted by objection made by counsel for DYFS. When the caretaker mother resumed the topic, she stated:

A: ... My assumption was [the child]'s not available for that—eligible for that. Because she's not 12. So I just, kind of, threw it out.

When defense counsel asked her whether she would accept kinship legal guardianship, she stated:

A: If the court and everybody could come up with something that was in the best interest of [the child] then I would go with whatever that was.

On redirect examination, she summed up her desire as to the outcome of the proceedings:

A: I just want to do what's best for [the child]. I—I have known [the father] for a very long time. I've known my sister for even longer. My sister is not good. And we can tell by that just coming here and she's not here for her daughter.

I don't want [the child] to lose her father. I want [the child] to stay with me. Because I don't think that he has finished recovery. He needs to finish it for himself. I want him to be a dad to her. But that can't—she needs—she needs the stability and the structure that she has.

She is such a bright little girl. And I wish you knew her. She's a wonderful little girl.

He needs to focus on himself. And [the child] needs to have a life.

The simple thoughtfulness and altruistic motives of the maternal aunt are apparent in these excerpts from her testimony. But also apparent is her lack of an adequate and accurate understanding of a potential alternative to termination of the parental rights of persons that she considers to be part of her family and intends to allow to participate in the child's life. The maternal aunt was entitled to know that kinship legal guardianship is not limited to children twelve years or older and to consider whether that option suited better her long-term wishes for the child and the rest of her family.

The caseworker's misinformation should have been explicitly corrected, and the prospective adoptive mother should have

been given a reasonable time to consider the option of kinship legal guardianship with accurate advice. Although kinship legal guardianship cannot be used as a defense to the proper termination of parental rights, *P.P., supra,* 180 *N.J.* at 513, 852 *A.*2d 1093, it should not be excluded as an alternative by means of faulty information.

We conclude that a remand is necessary for the Family Part to establish on the record that the maternal aunt and her husband have received correct information, that the differences between kinship legal guardianship and adoption have been explained to them, and that they have indicated their preference for one or the other as in the best interest of the child.[4] We direct that the Family Part conduct a hearing within sixty days and report its findings and conclusions to this court.

Affirmed in part, reversed and remanded in part. We retain jurisdiction.

---

[4] Having determined that a remand is necessary, we need not address the father's constitutionally-based argument about a DYFS policy disfavoring kinship legal guardianship.