# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1365-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.F.,

    Defendant,

and

J.T.,

    Defendant-Appellant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF L.J.F.-W.,
a minor.

_____

Submitted August 27, 2025 – Decided September 17, 2025

Before Judges Gooden Brown and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Cumberland County, Docket No. FG-06-0021-24.

Jennifer N. Sellitti, Public Defender, attorney for appellant (James D. O'Kelly, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor L.J.F.-W. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant J.T.[1] appeals from the November 15, 2024 judgment of guardianship that terminated his parental rights to his son, L.J.F.-W., born January 2023. The child has been in the care of an unrelated resource parent, N.M.-P., since his removal in May 2023. L.J.F.-W.'s mother, N.F., executed an identified surrender of her parental rights to the resource parent and is not participating in this appeal. Both the Division of Child Protection and

---

[1] Pursuant to Rule 1:38-3(d)(12), we use initials or pseudonyms to protect the confidentiality of the participants in these proceedings.

Permanency (Division) and the Law Guardian support termination. Based on our review of the record and the applicable legal principles, we affirm.

I.

By way of background, N.J.S.A. 30:4C-15.1(a), as revised in 2021, requires the Division to petition for the termination of parental rights on the grounds of the "best interests of the child" if the following standards are met:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The [D]ivision has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

The Division "bears the burden of proving each of those prongs by clear and convincing evidence." N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 606 (2007). The four criteria "are not discrete and separate," but rather "relate to and overlap with one another to provide a comprehensive standard that

3

identifies a child's best interests." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 166 (2010) (quoting N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 506 (2004)). "The considerations involved in determinations of parental fitness are 'extremely fact sensitive' and require particularized evidence that address the specific circumstances in the given case." In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999) (quoting In re Adoption of Child. by L.A.S., 134 N.J. 127, 139 (1993)).

II.

On May 31, 2024, the Division filed a verified complaint to terminate defendant's parental rights and award the Division guardianship of L.J.F.-W. The complaint recounted the Division's first involvement with the family when it received a referral that L.J.F.-W. tested positive for fentanyl and cocaine at birth and was administered morphine for withdrawal symptoms; that his mother, N.F., admitted to being a "heroin addict" and left the hospital against medical advice; and that N.F. initially named L.W. as the child's father. Two months after his birth, L.J.F.-W. was discharged to L.W.'s care until paternity testing confirmed that L.W. was not L.J.F.-W.'s biological father. The child was then removed at L.W.'s request and placed in N.M.-P.'s home where he has remained since placement.

A-1365-24

The complaint recited that after N.F. informed the Division that defendant was the possible father, the Division located defendant in a trailer park on July 27, 2023. The Division's contact sheet indicated that defendant "seemed to be under the influence of something" and that "his eyes were red [and] glassy and [his] pupils were pinned." On October 2, 2023, paternity testing confirmed that defendant was L.J.F.-W.'s biological father. On October 12, 2023, defendant was notified of the test results and, in an October 16, 2023 meeting, during which defendant indicated that he wanted to parent his son with N.F., the Division recommended defendant undergo a substance abuse evaluation and random drug testing.

During the meeting, although defendant denied any mental health or substance abuse issues, he admitted using marijuana and appeared "unkept." Additionally, a background check on defendant revealed pending drug charges. Defendant subsequently failed to comply with the Division's twelve requests for a substance abuse evaluation from October 2023 through August 2024, at one point stating he "[did] not believe in evaluations." Defendant also refused to submit to multiple requests for urine screens. Further, despite being advised by Division personnel about the importance of visitation to establish a bond with his son, defendant insisted on weekly, as opposed to biweekly visits, and only

sporadically attended visits with his son through December 2023, after which defendant discontinued visits until May 2024. Defendant also failed to appear for an April 2024 psychological evaluation to assess whether he could independently parent his son and to identify any needed services.

On April 22, 2024, the trial court determined that the permanency plan of termination of parental rights followed by adoption was appropriate based on defendant's failure to engage in services. On May 10, 2024, during a home visit, N.M.-P. confirmed that she wanted to adopt L.J.F.-W. The Division caseworker explained to N.M.-P. the difference between Kinship Legal Guardianship (KLG) and adoption and N.M.-P. acknowledged understanding the distinction between the two.

On the same date, the Division adoption worker visited defendant to advise him that the case had been transferred to the adoption unit but the worker was not allowed to enter the home. When asked about housing and income, defendant acknowledged receiving mail at that address but stated "it [was not] his house." Defendant also reported that he "cut[] grass on a daily basis," that he "gets about $900 in [S]ocial [S]ecurity," and that "if he had to get a place[,]

A-1365-24

he would be able to get one."[2]  Defendant agreed to undergo a psychological evaluation, which was conducted by Alan J. Lee, Psy.D., on August 28, 2024, shortly before trial.  Based on the evaluation, defendant was not deemed suitable for independent caretaking of L.J.F.-W.

Prior to trial, the Division assessed three of N.F.'s relatives—A.M., D.M., and S.F.—as possible placement options for L.J.F.-W., but each was ruled out and received rule-out letters in June 2023.  The Division also looked into defendant's sisters as possible placement options for L.J.F.-W. but they would only agree if they "g[ot] a commitment from [defendant] that he was going to follow through with services," which commitment was not forthcoming.  In February 2024, the Division attempted to contact N.F.'s mother and uncle but could not reach either of them.  The Division also tried to reach N.F.'s sister but instead reached the sister's mother-in-law, who advised that the sister was "not in a position to" take in L.J.F.-W. as she had three of her own children and was

---

[2]  Division personnel encouraged defendant to seek stable housing by completing a Section 8 housing application.  Defendant said he did not have a computer and did not know how to use one.  He was told he could access a computer and receive help filling out an application at a library.  During a subsequent discussion about housing, defendant assured the caseworker that "he work[ed] for a lot of real estate people so if he need[ed] a place he [could] get one."

A-1365-24

pregnant at the time. The Division also contacted N.F.'s brother, who said he was unable to care for L.J.F.-W.

At the November 8, 2024 trial, Lee, who was qualified as an expert in psychology, and Barbara Williams, a Division caseworker, testified for the Division. Numerous documentary exhibits were also admitted into evidence, including Lee's August 28, 2024 psychological evaluation of defendant.

Lee's trial testimony was consistent with his August 28, 2024 written evaluation. According to Lee's written evaluation, defendant "reported some adult criminal problems, although his accounts . . . seemed to underrepresent the kinds and extent of criminal charges (regardless of disposition) that were reported in collateral sources of information." In the evaluation, Lee diagnosed defendant with unspecified disruptive, impulse control, and conduct disorder; history of unspecified other or unknown substance-related disorder; borderline intellectual functioning; ruled-out specific learning disorder of reading; and unspecified personality disorder with antisocial and avoidance traits.

Specifically, the evaluation identified "cognitive and intellectual issues, maladaptive personality and character issues, marginal and unstable life circumstances, patterns of poor personal functioning, a lack of parenting knowledge and skills, and risks for ongoing life instabilities, criminal problems,

and substance abuse," all of which "raise[d] concerns against [defendant] being an independent caretaker to [L.J.F.-W.]." In the evaluation, Lee opined that defendant's ability for change was poor, recommended "other permanency planning" for L.J.F.-W., ruled out unification with defendant, and recommended "[v]arious services" for "[defendant's] personal benefit, and not intended for the purpose of trying to effect reunification of [L.J.F.-W.] to him."

During his testimony, Lee described defendant's parenting knowledge, skills, and experiences as "lacking" and "[m]any of his responses" to questions about "developmental milestones" as "typically and mostly erroneous." Lee testified that defendant had "poor coping skills," "ease of being overwhelmed by . . . complex tasks," and "[d]ifficulties with responding in a responsible, consistent way to tasks." He reiterated the same diagnostic impressions contained in his written report and reaffirmed the validity of his recommendations at the time of trial.

Based on his evaluation, Lee "did not support [defendant] as an independent caretaker of [L.J.F.-W.] at the time and within the foreseeable future." Lee again recommended "other permanency for [L.J.F.-W.]" and "very clearly and explicitly indicated . . . [his] service recommendations were for

[defendant's] personal benefit," and "not made with the intent of trying to effect reunification of [L.J.F.-W.] to [defendant]."

When asked how he reached his conclusions, Lee elaborated:

> [Defendant] was aware of paternity since about October of 2023 and . . . collateral sources of information indicate that across time, there has been limited compliance with the recommended services and interventions made to [defendant].

> His involvement with the child across sizable periods was limited. For example, . . . records indicated that there w[ere] at least several months[,] February, March, April of 2024, in which visitation was offered but . . . [defendant] did not attend.

> . . . There have been and there are concerns about [defendant's] functioning in terms of his behavior, his maladaptive personality and character traits, his lack of knowledge about parenting and child rearing.

> And all of this needs to be viewed in the context of this child because . . . [L.J.F.-W.] is about [one-and-a-half] years old. He is a very young child. We know young children of this age are very vulnerable, very helpless to take care of themselves.

> Instead, they rely heavily, if not exclusively, on . . . adults around them to protect them, guide them, nurture them, support them. And these are tasks that [defendant] is not able to do at this time and within the foreseeable future.

> . . . [Defendant's] prognosis for significant and lasting change is poor. Historically, he has been limited in his compliance. As I interviewed and evaluated him,

A-1365-24

his insight and his awareness of issues was limited. He was defen[sive], guarded, [and] minimiz[ed] . . . issues.

Lee added that, "based on [his] extensive evaluation of [defendant]," defendant did not "possess th[e] emotional set of skills to help mitigate the impact" if L.J.F.-W. was removed from his current, stable resource home.

During her testimony, Williams detailed the Division's involvement with the family since L.J.F.-W.'s birth and testified consistently with the Division records. According to Williams, once defendant was identified as L.J.F.-W.'s father through paternity testing, the Division offered services, including substance abuse evaluations, urine screens, and visitation. Williams testified defendant was scheduled for substance abuse evaluations at least twelve times but failed to complete a single substance abuse evaluation and failed to submit to drug screening fifteen times. Williams also testified that despite being offered transportation assistance, defendant failed to attend the scheduled April 2024 psychological evaluation to determine what services, if any, were required. Additionally, Williams testified that defendant missed months of scheduled visits with L.J.F.-W. with no explanation, and that his communication with the Division "as it related to services" was inconsistent.

Williams recounted the numerous family members and friends the Division contacted about possibly serving as L.J.F.-W.'s caregiver, including

11

S.F., whom the Division contacted twice. Both times, S.F. relayed that she was unable to care for the child. As to N.M.-P., Williams testified that a Division caseworker had discussed with her the differences between KLG and adoption, and N.M.-P. was committed to adopting L.J.F.-W. but said she was open to continuing a relationship between L.J.F.-W. and his biological family.[3] Williams also reported that L.J.F.-W. was "happy," "relaxed," and "comfortable" in his resource home and was developing a relationship with N.M.-P.'s other children. In contrast, Williams had never been inside defendant's home, and defendant had told her that his home "was not appropriate for [L.J.F.-W.] to come and live."

Following the trial, the judge issued a comprehensive oral opinion, concluding that the Division established, by clear and convincing evidence, all four prongs of the best interests standard codified at N.J.S.A. 30:4C-15.1(a). Accordingly, the judge terminated defendant's parental rights to L.J.F.-W., awarded guardianship of L.J.F.-W. to the Division for the purpose of adoption, and determined it was in L.J.F.-W.'s best interests to remain with N.M.-P. with the goal of adoption. In his decision, the judge credited each witness's testimony

---

[3] It was later discovered by sheer happenstance that N.M.-P. was good friends with L.J.F.-W.'s paternal aunt, with whom N.M.-P. allowed L.J.F.-W. to have liberal visitation.

and made detailed factual findings consistent with their testimony. The judge recited the statutory factors and applied the governing legal principles to his factual findings.

In his credibility assessments, the judge determined Lee was "highly credible" and "professional" in his responses. The judge found "nothing . . . to suggest that . . . Lee did not have a firm command of the subject matter" and determined that Lee presented himself as "someone who had no interest in the outcome" but "[w]as just interested in communicating to the [c]ourt truthful and honest testimony." Likewise, the judge found Williams "extremely credible," both in the "substance" of her testimony and her "demeanor." According to the judge, Williams "had a command of the subject matter" and "was clearly well-versed in the facts of this case."

The judge went on to address each prong in turn. As to prong one, the judge found "no viable parental relationship . . . has ever been established between [defendant] and [L.J.F.-W]." The judge explained:

> [Defendant] does lack the ability to minimally parent . . . and nurture [L.J.F.-W.], even with such a low threshold of it being a minimal level of care-taking functions.
>
> There is, as established by this trial, no safe home [f]or the child, no viable home for the child to reside

with [defendant. Defendant] lacks the ability right now.

> And perhaps . . . we would be at a different stage had he actually gone to his psychological evaluation, these recommendations may have been made in April or May of 2024. We may have a completely different case.

> Maybe we don't, but what we do have is his diagnosis from the doctor and his impressions and the opinion of . . . Lee. This child's safety, health[,] and development will not be served in any constructive way where [defendant] is the parent, therefore endangering the child.

Likewise, the judge found the Division established prong two, "as evidenced by [defendant's] complete lack of engagement in services." The judge acknowledged that the Division was justified in ordering substance abuse related services given "the criminal history," regardless of whether there were convictions, and the July 27, 2023 encounter in the trailer park during which defendant was "suspected of being under the influence." The judge explained that defendant failed to avail himself of the opportunities afforded, recounting:

> Four separate referrals resulting in [twelve] separate scheduling events for a substance abuse evaluation. A no-show for an . . . early April service by the Division for a psychological evaluation. No random urine screens.

> And completely taking himself out, with no plausible or reasonable explanation, why he abandoned

14

this child for five months when he had the court-ordered . . . and the constitutional right and the Division was providing the vessel to exercise that right of visitation between December 2023 and May of 2024.

He has been unwilling to eliminate the harm. He has been unwilling to engage with these services that have been provided, and I also find . . . he's unable to eliminate that harm within the foreseeable future.

. . . .

. . . Lee opined that . . . [defendant's] prospects for ever possessing the ability to minimally care for this child[] are very poor in order to permit [defendant] to provide a safe, stable home for the child. And additionally . . . the delay of permanency will obviously add to this harm. . . . Lee convince[d] th[e] [c]ourt as to the importance of permanency.

. . . .

. . . I do find that [defendant] does not possess nor are his prospects anything but poor to overcome any of these barriers and even best[-]case scenario, [twelve] to [fifteen] months. We are now asking this child to double his age, have permanency delayed . . . [o]n the hope and the prayer that [defendant] will actually go to his services, take advantage of his services and progress on these services to a point where he is minimally able to provide for this child.

As to prong three, the judge found "by clear and convincing evidence that . . . once [defendant] was identified as the father, the Division immediately jumped into its role" and "made reasonable efforts to provide services to

15

[defendant] to correct . . . the[] circumstances that led to the placement of the child outside the home." Critically, the judge found "the Division looked to multiple . . . alternatives as far as placement," by assessing "about [fifteen] different individuals," all of whom were "ruled out."

Additionally, the judge noted that Division personnel discussed with and educated the resource parent regarding "the difference between KLG and adoption." The judge continued:

> [A]fter being provided with that information, the resource parent[] made an informed decision that [her] preference is adoption. Th[e c]ourt does not have the authority, nor does the Legislature or anybody else on this planet, to tell the resource parent[] what . . . decision must be made.
>
> [She is] free to make a . . . clear-minded, educated, knowing[,] and voluntarily-made decision and, based on what . . . Williams testified, I find that the Division did provide the resource . . . [parent] with that option, with that education. The resource parent has spoken.

Lastly, as to prong four, "incorporat[ing] . . . all of [the court's] previous findings," the judge explained:

> There is very little practical harm that is going to be done to this child that hasn't already been done. [Defendant] inflicted . . . a lot of that harm by failing or refusing to take advantage of these services that . . . could have really turned out to have a different ending.

16

But [defendant] is somewhat of a stranger to this child.  He has some periodic visits but only has taken advantage of about half of those visits.  He has not established, and nor is there any evidence to establish, that he has any type of nurturing relationship with this child.

. . . Williams testified . . . [t]hat this child is well-adjusted, he is loved, he is nurtured, he has siblings.  He is trusting, he is cuddling. . . .  [H]e is in a wonderful place right now with his prospective adoptive parent[].

So to find based on all that . . . that termination of parental rights would do no more harm than good, that is an impossibility because . . . there's no rational trier of fact that could find anything but prong four has been met.

Poignantly, the judge acknowledged:

[W]e do not terminate parental rights simply because someone may have some substance abuse issues.  That is certainly not the end-all, be-all in this case.

We do not terminate parental rights just because someone just simply doesn't comply with certain services, but they're a part of the equation.  Stand alone, they do not rise to that level to justify termination of parental rights, but when viewed together, they paint an entirely comprehensive and thorough picture of what is really going on here.

The judge entered a memorializing order, and this appeal followed.

On appeal, defendant challenges the judge's findings on all four prongs.

He also raises evidentiary and due process issues.  Specifically, defendant argues

17

the Division failed to make reasonable efforts to reunify him and L.J.F.-W., provide services, conduct a bonding evaluation, or consider alternative placement for L.J.F.-W. We disagree.

III.

Our scope of review on an appeal from an order terminating parental rights is limited. N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018). In such cases, we will generally uphold the trial court's factual findings, so long as they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014) (citing N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)).

Indeed, we give substantial deference to Family Part judges' special expertise and opportunity to observe the witnesses firsthand and evaluate their credibility, id. at 552-53, "and to gain a 'feel of the case' over time, thus supporting a level of factual familiarity that cannot be duplicated by an appellate court reviewing a written record," N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 220-21 (App. Div. 2013) (quoting E.P., 196 N.J. at 104). "We also defer to the trial court's assessment of expert evaluations." Id. at 221. Thus, a termination decision should only be reversed or altered on appeal if the

A-1365-24

trial court's findings are "so wholly unsupportable as to result in a denial of justice." P.P., 180 N.J. at 511 (quoting In re Guardianship of J.N.H., 172 N.J. 440, 472 (2002)).

Even where the parent alleges "error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom," deference must be accorded unless the judge "went so wide of the mark that a mistake must have been made." N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007) (first quoting In re Guardianship of J.T., 269 N.J. Super. 172, 189 (App. Div. 1993); and then quoting C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989)). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." R.G., 217 N.J. at 552-53 (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

Guided by these standards, we are satisfied the judge's factual findings are amply supported by credible evidence in the record, and his legal conclusions are sound. The judge made copious findings as to each prong of N.J.S.A. 30:4C-15.1(a), and concluded that the Division met, by clear and convincing evidence, all of the legal requirements for the termination of parental rights. The judge's

19

opinion tracks the statutory requirements of N.J.S.A. 30:4C-15.1(a) and comports with applicable case law. See, e.g., N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 447-54 (2012); E.P., 196 N.J. at 102-11; K.H.O., 161 N.J. at 347-63; In re Guardianship of D.M.H., 161 N.J. 365, 375-94 (1999); N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 602-11 (1986).

Moreover, as public policy increasingly focuses on a child's need for permanency, it has resulted in the placement of "limits on the time for a birth parent to correct conditions in anticipation of reuniting with the child." N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 111 (App. Div. 2004); see also N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 438 (App. Div. 2001) ("Keeping the child in limbo, hoping for some long[-]term unification plan, would be a misapplication of the law."). To that end, the emphasis has "shifted from protracted efforts for reunification with a birth parent to an expeditious, permanent placement to promote the child's well-being." C.S., 367 N.J. Super. at 111 (citing N.J.S.A. 30:4C-11.1).

That is because "[a] child cannot be held prisoner of the rights of others, even those of his or her parents. Children have their own rights, including the right to a permanent, safe[,] and stable placement." Ibid. The question, then, is "whether the parent can become fit in time to meet the needs of the child[]."

20

A-1365-24

N.J. Div. of Youth & Fam. Servs. v. F.M., 375 N.J. Super. 235, 263 (App. Div. 2005); see also P.P., 180 N.J. at 512 (observing that even if a parent is trying to change, a child cannot wait indefinitely); N.J. Div. of Youth & Fam. Servs. v. B.G.S., 291 N.J. Super. 582, 593 (App. Div. 1996) (holding that the "termination action was not predicated upon bonding, but rather reflected [the child's] need for permanency and [the defendant's] inability to care for him in the foreseeable future"). Viewed through the lens of our decisional law, the judge's findings are supported by both the law and the public policy behind it.

In disputing the judge's findings as to prong one, defendant contends that the judge's conclusion that he and L.J.F.-W. did not have an established viable relationship was erroneous because no bonding evaluation was conducted. As to prongs one and two, defendant argues "it was unfair for the court to have relied on [Lee's] opinions" that defendant "did not possess basic parenting skills and would not be able to make proper decisions if [L.J.F.-W.] was sick or otherwise required care" because the Division did not make this assertion in its complaint.

In weighing the potential harm from terminating parental rights against a child's separation from the resource parent, a court must consider expert testimony "specifically directed to the strength of each relationship." In re

Guardianship of J.C., 129 N.J. 1, 25 (1992). When an action to terminate parental rights is not "predicated upon bonding," the proper inquiry focuses on the child's "need for permanency" and the biological parent's "inability to care for [the child] in the foreseeable future." B.G.S., 291 N.J. Super. at 593; see also M.M., 189 N.J. at 281 ("A child's need for permanency is an important consideration . . . .").

Here, even in the absence of a bonding evaluation, the record supports the judge's conclusion that L.J.F.-W. would be harmed if removed from his resource home and placed in defendant's care. That conclusion is supported by undisputed expert testimony regarding L.J.F.-W.'s need for permanency and defendant's inability to mitigate any resulting harm from removing L.J.F.-W. from his resource home. At the time of trial, L.J.F.-W. was twenty-one months old and defendant had known he was the baby's biological father for over one year.[4] Yet, defendant failed to consistently engage in services and had not spent a single day caring for his son since birth. Williams testified that while defendant was refusing to participate in services, L.J.F.-W. became well-

---

[4] The judge acknowledged that defendant's paternity was not confirmed until October 2023, and noted that he was not "starting th[e] clock until October of 2023," thus rebuffing defendant's claim that he was prejudiced by the Division's delay in establishing his paternity.

adjusted to his new home, where he was loved, nurtured, and cuddled.   Under the circumstances, we discern no reason to disturb the judge's findings.

We likewise reject defendant's assertion that the Division failed to establish prongs one and two because the judge erroneously relied on Lee's finding that defendant lacked necessary parenting skills, which the Division did not include in its complaint.  We need not address defendant's argument that the allegation was not included in the complaint because defendant failed to raise it before the trial court.  See Nieder v. Royal Indem. Ins. Co., 62 N.J. 229, 234 (1973) (explaining that "appellate courts will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.'" (quoting Reynolds Offset Co. v. Summer, 58 N.J. Super. 542, 548 (App. Div. 1959))).

Nonetheless,

> "[a] complaint . . . is not required to spell out the legal theory upon which it is based." Farese v. McGarry, 237 N.J. Super. 385, 390 (App. Div. 1989).  "Its necessary contents are only 'a statement of the facts on which the claim is based, showing that the pleader is entitled to relief, and a demand for judgment for the relief to which he deems himself entitled.'" Ibid.  (quoting R. 4:5-2).

A-1365-24

[N.J. Div. of Child Prot. & Permanency v. C.R.A.G.,
479 N.J. Super. 504, 529 (App. Div. 2024).]

That said, "[t]here can be no adequate preparation [for trial] where the notice does not reasonably apprise the party of the charges, or where the issues litigated at the hearing differ substantially from those outlined in the notice." N.J. Div. of Youth & Fam. Serv. v. B.M., 413 N.J. Super. 118, 127 (App. Div. 2010) (second alteration in original) (quoting H.E.S. v. J.C.S., 175 N.J. 309, 322 (2003)).

Here, defendant was on notice of the reasons the Division sought to terminate his parental rights, which included his failure to engage in services—including, by the time the complaint was filed, a psychological evaluation to assess, among other things, his parenting deficits. Thus, any lack of notice of Lee's findings was attributable to defendant's own failure to engage in services[5] and any omission of a parenting deficit allegation in the complaint did not constitute unfair surprise or prevent defendant from defending himself against the accusations.

---

[5] For the same reasons, for the first time on appeal, defendant argues his constitutional right to due process was violated because the complaint did not mention any mental health concerns as described by Lee. However, under the plain error standard of review, we discern no error "clearly capable of producing an unjust result" and likewise reject the argument. Rule 2:10-2; see also N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 622 (App. Div. 2010).

A-1365-24

In his challenge to the judge's prong three findings, defendant asserts that alternatives to termination of parental rights were not considered "in light of [the Division's] speedy rule-out of S.F." "As part of its analysis of the third prong, the court is required to consider alternatives to the termination of parental rights." H.R., 431 N.J. Super. at 226 (citing N.J.S.A. 30:4C-15.1(a)). Alternatives to termination of parental rights can include placement with a relative. N.J.S.A. 30:4C-12.1(a); see also S. Health, Hum. Servs. & Senior Citizens Comm. Statement to S. 3814 3 (June 10, 2021) (clarifying that the court is required to first consider placement of the child with a relative or a person with a kinship relationship when determining if the child should be placed in the custody of another suitable person).

Here, the Division considered over a dozen possible placements for L.J.F.-W. before ruling them out for various reasons. In particular, S.F. received rule-out letters on June 13, 2023, and February 16, 2024. The first letter stated that S.F. "declin[ed] ability due to a lack of space." The second letter stated that S.F. was ruled out "based on [her] saying that [she was] unable to be a placement option for [L.J.F.-W]." Neither rule-out letter was administratively appealed. We are therefore satisfied that the Division appropriately considered relatives for L.J.F.-W. before placing him in a non-related resource home.

Equally unavailing is defendant's contention that the judge applied an incorrect standard when analyzing prong four. On the contrary, the judge undertook the proper analysis by focusing on L.J.F.-W.'s need for permanency and relying on Lee's unrefuted testimony that defendant could not provide appropriate care for his son and would be unable to do so in the foreseeable future. See B.G.S., 291 N.J. Super. at 593.

Defendant also challenges the judge's various findings claiming: (1) the Division failed to present "clear and convincing evidence . . . that [he] was unwilling or unable to secure suitable housing," and failed to provide assistance securing stable housing; and (2) the Division failed to provide adequate services, including financial services, case planning, family team meetings, encouraging visitation, parenting skills classes, services recommended by Lee, and transportation. Defendant's contentions are undermined by the record.

The standard for terminating parental rights is whether the "parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child." N.J.S.A. 30:4C-15.1(a)(2) (emphasis added). Harm may also be caused by a parent's failure to provide "attention and concern" for a child, A.W., 103 N.J. at 613, and by the parent's "failure to take responsibility for [the] child[] and to perform any

substantial parental functions," D.M.H., 161 N.J. at 383; see ibid. (holding that parental rights may be terminated based upon risk of harm, even in the absence of physical harm); see also B.G.S., 291 N.J. Super. at 591-93 (holding that the parent's failure to provide a permanent home may, in some circumstances, authorize termination of parental rights).

Defendant had ample opportunities to participate in Division-offered services but failed to comply. He never completed a substance abuse evaluation despite four referrals and at least twelve scheduling attempts, failed to submit to urine screens, failed to undergo his initial scheduled psychological evaluation to assess his needs, and failed to consistently attend visitation to develop a bond with his son. At various times, defendant vacillated between being homeless and having housing or the ability to obtain housing, but made little to no effort to become a viable parent for his son. See H.R., 431 N.J. Super. at 223-24 (explaining that "[w]hen the condition or behavior of a parent causes a risk of harm, such as impermanence of the child's home and living conditions," and "the parent has not cured the problems that led to removal of the child," the first two prongs are satisfied).

We also reject defendant's contention that the services the Division offered were unreasonable. Under prong three, "[t]he diligence of [the

A-1365-24

Division's] efforts on behalf of a parent is not measured by their success[,] . . . [but] must be assessed against the standard of adequacy in light of all the circumstances of a given case." D.M.H., 161 N.J. at 393. "[E]ven [the Division's] best efforts may not be sufficient to salvage a parental relationship," F.M., 211 N.J. at 452, and "[e]ven if the Division had been deficient in the services offered to [the parent], reversal would still not be warranted, because the best interests of the child controls," N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 621 (App. Div. 2007). Here, the Division attempted to provide reasonable services to defendant but he repeatedly refused to avail himself of the opportunities.

Defendant also argues the judge's decision "rested almost exclusively on hearsay and speculative testimony." Specifically, defendant asserts that Williams should not have been permitted to testify to a conversation that a non-testifying caseworker had "discuss[ing] the differences between KLG and adoption" with the resource parent.[6] Additionally, defendant objects to "the court plac[ing] significant weight on a . . . contact sheet [created by the Division]

_____

[6] See N.J. Div. of Child Prot. & Permanency v. M.M., 459 N.J. Super. 246, 275-76 (App. Div. 2019) ("Subject to potential timely objection, we do not require, per se, the testimony of . . . [a] resource parent. . . about their views concerning adoption and KLG.").

that described a non-testifying caseworker's belief that she may have had a conversation with [defendant] while he was under the influence of an unknown substance." Defendant further asserts it was erroneous for the judge to rely on "speculative testimony about [his] alleged criminal history" from both Lee and Williams. Lastly, defendant submits the judge erred in relying on a statement that defendant "allegedly informed a caseworker that his home was not appropriate for L.J.F.[-W.]".

Because defendant did not object at trial, we review these arguments for plain error. R. 2:10-2. Under the plain error standard, defendant carries the burden of demonstrating that the error was "of such a nature as to have been clearly capable of producing an unjust result" and therefore should not be disregarded by this court. Ibid. "The mere possibility of error is insufficient for reversal," N.S., 412 N.J. Super. at 622, and "[r]elief under the plain error rule, R. 2:10-2, at least in civil cases, is discretionary and 'should be sparingly employed,'" Baker v. Nat'l State Bank, 161 N.J. 220, 226 (1999) (quoting Ford v. Reichert, 23 N.J. 429, 435 (1957)).

"[W]e afford '[c]onsiderable latitude . . . [to a] trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" N.J. Div. of Child Prot. & Permanency v.

29

N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (omission and second and third alterations in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016)).  Further, where "objectionable hearsay is admitted in a bench trial without objection, we presume that the fact-finder appreciates the potential weakness of such proofs, and takes that into account in weighing the evidence."  N.J. Div. of Child Prot. & Permanency v. J.D., 447 N.J. Super. 337, 349 (App. Div. 2016).

Division reports are generally admissible under N.J.R.E. 803(c)(6)'s business record exception to hearsay.  N.T., 445 N.J. Super. at 495-96; see R. 5:12-4(d) (providing that the Division "shall be permitted to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants").  Because "requiring all [Division] personnel having contact with a particular case to give live testimony on all the matters within their personal knowledge would cause an intolerable disruption[,] . . . it becomes necessary to allow certain evidence to be produced in a hearsay form." N.T., 445 N.J. Super. at 496 (first alteration in original) (quoting In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969)); see also N.T., 445 N.J. Super. at 487 (discussing requirements for admitting Division reports under N.J.R.E. 803(c)(6)).

Applying these principles, because the Division contact sheets were admissible as business records, we discern no error, much less plain error. The contact sheets were prepared by Division personnel in their capacity as caseworkers. We also discern no error in the judge allowing Lee to testify to his discussion with J.T. during the psychological evaluation. We are satisfied that the judge appropriately considered and weighed all the evidence, J.D., 447 N.J. Super. at 349, and see no reason to disturb the judge's conclusions, which are amply supported by the voluminous record.

To the extent we have not expressly addressed any of defendant's arguments, we are satisfied they are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

31

A-1365-24