# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2073-24

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

    Plaintiff-Respondent,

v.

A.E.,

    Defendant-Appellant,

and

J.W. (deceased),

    Defendant.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF S.W.,
a minor.

_____

Argued January 8, 2026 – Decided January 15, 2026

Before Judges Mawla, Marczyk, and Bishop-Thompson.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FG-20-0015-23.

Adrienne Kalosieh, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Adrienne Kalosieh, of counsel and on the briefs).

Mary L. Harpster, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; Janet Greenberg Cohen, Assistant Attorney General, of counsel; Mary L. Harpster, on the brief).

Julie E. Goldstein, Assistant Deputy Public Defender, argued the cause for minor S.W. (Jennifer N. Sellitti, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; Julie E. Goldstein, of counsel and on the brief).

PER CURIAM

Defendant A.E.[1] appeals from a February 24, 2025 guardianship judgment terminating her parental rights to her daughter, S.W. We affirm.

Defendant has a long history of involvement with the Division of Child Protection and Permanency (Division), commencing in 2013 when police reported she and then nine-month-old S.W. were homeless. In 2019, the Division received referrals regarding defendant's physical abuse and neglect of

---

[1] We use initials pursuant to Rule 1:38-3(d).

S.W.  Defendant's unaddressed mental illness was the primary cause of the referrals.  The Division ultimately substantiated defendant for neglect and employed family preservation services to assist her, but she continued to deny any mental health issues and failed to benefit from the services.

In 2020, defendant's mother, R.S., who resided in North Carolina, agreed to take in S.W.  Meanwhile, defendant refused to attend a psychiatric evaluation.  A psychological evaluation performed by the Division's expert concluded defendant's mental health put S.W. at risk.  While S.W. resided with R.S., the Division began to evaluate whether the child could be placed with her biological father and paternal grandmother.  North Carolina Child Protective Services conducted a welfare check on R.S. and S.W., and reported the child was doing well and enjoyed living with her grandmother.  However, R.S. would not allow the North Carolina authorities to walk through her home.  In October 2020, R.S. ultimately returned the child, expressing she "tried to help out but . . . needed to get back to work" and "could no longer care for her granddaughter."

Defendant continued not to address her mental health issues, or complete the treatment and counseling provided by the Division.  In September 2021, the Division received a referral from a hospital advising defendant was admitted after she gave birth at home in S.W.'s presence.  The Division had no knowledge

3

defendant had been pregnant. It entered a safety protection plan with defendant and the newborn child's father,[2] which required defendant to participate in mental health services and be supervised while she was with the newborn. The Division continued to provide services to the family.

R.S. told the Division she was willing to care for defendant's children in North Carolina if the Division provided financial assistance. A few weeks after delivering the newborn, defendant became psychiatrically hospitalized and was given outpatient services. An officer who responded to defendant's home testified it had "a heavy in[fest]ation of cockroaches on the walls and in the bed," and he had to stop S.W. from consuming cereal with spoiled milk. Because neither S.W.'s father nor the father of defendant's other child could care for S.W., the Division removed S.W. and placed her in a non-relative resource home, where she has remained since. The trial judge granted the Division custody of S.W. following the removal. The Division began searching for relative placements.

In November 2020, the hospital discharged defendant after she declined services. Although the Division attempted to arrange visits between defendant and S.W., defendant did not see S.W. until December.

---

[2] This is not S.W.'s father.

A-2073-24

The Division had S.W. psychologically evaluated in October 2021. The evaluator diagnosed the child with "[u]nspecified [t]rauma- and [s]tressor-[r]elated disorder," and recommended individual psychotherapy. S.W. reported she was doing well in the resource home. The resource parent described S.W. as a "very talented child," but noted she occasionally engaged in destructive behavior and had irregular sleep habits.

In December 2021, the judge ordered the Division to obtain an Interstate Compact on the Placement of Children (ICPC) assessment of R.S. The Division followed suit and sought a foster home study because R.S. had requested financial assistance. In April 2022, the North Carolina authorities denied the ICPC request, noting R.S. "was a known perpetrator for improper discipline on her own biological children in 1995 and 2001." R.S. claimed she did not recall her alleged mistreatment of her children. As a result of the ICPC, the Division could not place S.W. with R.S., but nonetheless continued phone contact and encouraged visits between her and the child.

In February 2022, therapeutic visitation between defendant and S.W. was suspended because S.W. became "visibly distraught" during a visit due to defendant's "disordered thought content, symptomatic behavior, and emotional dysregulation." In March 2022, defendant appeared at a Division office,

asserting she worked in cybersecurity and the hospital "inject[ed mental health] services into her head." She claimed "everyone was lying" about her diagnoses and she was being watched. In April 2022, the judge suspended defendant's visits until she complied with mental health services. After this point, defendant had no further visits with S.W.

Defendant was psychiatrically hospitalized in June and July 2022. She claimed she was a doctor who worked at the hospital and that her prior hospitalizations were a mistake. Defendant denied having mental health issues or requiring medication, and inconsistently complied with taking her medication. She was discharged to a behavioral health program, where she continued to manifest poor mental health and denied having a mental health history.

The Division continued to search for relative placements in July and August 2022. However, the prospective placements either did not respond or claimed they did not know the family. In August 2022, R.S. admitted she had beaten defendant with a curtain rod in 1991. Defendant expressed gratitude that S.W. would remain in New Jersey when she heard about the attempt to place the child with R.S.

6

In September 2022, the judge approved the Division's permanency plan to place S.W. with her father, but he subsequently died in November 2022. The Division changed its permanency plan to a termination of parental rights followed by adoption. The judge rejected the Division's plan in December 2022, January 2023, and February 2023. Meanwhile, the Division assessed fifteen potential relative placements it had identified at S.W.'s father's funeral, plus the deceased father's girlfriend, and requested R.S.'s records from North Carolina to continue evaluating her.

In December 2022, S.W.'s resource parent informed the Division she would only consider adoption because she had a prior negative experience with kinship legal guardianship (KLG). The resource parent understood KLG gave her decision-making authority for S.W., but explained experience taught her "if a birth parent is saying the opposite, it becomes too complicated for the child."

The record indicates defendant lost contact with the Division for several months before she appeared on December 13, 2022, for the final hearing in the FN phase of the case. In January 2023, defendant reported she was too busy running for President of the United States to attend subsequent court hearings.

In February 2023, the trial judge approved the Division's permanency plan of termination of parental rights followed by adoption. The prior month, R.S.

A-2073-24

informed the Division she would care for S.W. without financial assistance. In April 2023, at the initial hearing on the Division's order to show cause following the filing of the guardianship complaint, defendant's attorney advised R.S. would be seeking custody of S.W. Later that month, the Division reminded R.S. she needed to file a complaint for custody because her substantiation of abuse in North Carolina prevented the Division from placing S.W. with her. The Division also facilitated visitation by flying R.S. to New Jersey in May 2023.

R.S. filed a non-dissolution complaint for custody on May 25, 2023. Defendant's attorney also asked the judge to place the child with R.S. However, S.W. told the Division she did not want to be adopted by R.S. because her resource parent was "very kind and loving" and she wanted to stay with her to finish school and continue her extracurricular activities. She did not mind continuing contact with R.S. and occasionally visiting her.

The potential relative placements contacted by the Division either did not respond or were unable or unwilling to care for S.W. Defendant's whereabouts were unknown between January and August 2023.

R.S. denied abusing defendant and claimed her late husband was the abuser. However, in August 2023, the Division received records from North Carolina showing R.S. was substantiated for abusing her children on two

occasions. Notwithstanding these findings, the Division brought R.S. to New Jersey in August 2023 for visitation and psychological and bonding evaluations by its expert and the Law Guardian's expert.

Although the Law Guardian's expert found S.W. had a secure emotional attachment to R.S., the child did not view her grandmother as a "primary provider of her needs." R.S. was unable to provide S.W. with a safe and stable home. The expert opined disrupting S.W.'s placement and relationship with her resource parent and peers would cause her significant emotional harm. The Division's expert reached similar conclusions.

Defendant resurfaced and attended court on August 22, 2023. She refused to provide her contact information except for an email address, and claimed she had been attending medical school and operated a cleaning business with 59,000 clients. Although defendant promised to attend future court proceedings, she did not appear again until a November 2, 2023 hearing. She also missed several psychological evaluations.

The trial judge initially scheduled the non-dissolution custody hearing for September 2023 and the guardianship trial for the following month. However, defendant's attorney requested an adjournment of the custody hearing to retain an expert evaluation. The judge adjourned both trials. Although R.S. was upset

about the adjournment and having to submit to another evaluation, the Division transported her to New Jersey so defendant's expert could evaluate her in October 2023.

Defendant's mental health did not improve. She was involuntarily committed in November 2023. Following a sixteen-day hospital stay, she was discharged to a behavioral health program where she remained through April 2024. Thereafter, defendant was discharged to a long-term partial care program. She continued to deny her symptoms and contest her diagnosis.

At a January 16, 2024 hearing, the Division informed the judge the expert retained by defendant's attorney had previously evaluated defendant on behalf of the Division in 2020. The trial judge held a N.J.R.E. 104 hearing and the parties agreed there was a conflict. As a result, the judge adjourned both trials and the defense retained another expert.

In February 2024, R.S. and the resource parent attended mediation. Afterwards, they entered a consent order memorializing R.S. had withdrawn her application for custody and the non-dissolution complaint would be dismissed without prejudice. R.S. was represented by counsel in the non-dissolution matter. Subsequently, in March and April 2024, the Division and the Law Guardian's experts, respectively, completed their psychological evaluations of

10

defendant, and both opined she could not safely care for S.W. for the foreseeable future.

On May 2, 2024, the defense informed the judge it would not submit any expert reports. Later that month, the defense attempted to submit a letter from a new expert, opining defendant should have visitation with S.W. The Law Guardian objected to the letter because it constituted a net opinion. The judge did not consider the letter but granted the defense an adjournment of the guardianship trial to allow more time to prepare because defendant was receiving a new attorney as her prior attorney was leaving the Office of Parental Representation.

The guardianship trial took place over six days between September and October 2024. The Division presented the testimony of: two caseworkers; an adoption worker; the clinical director of the long-term partial care program and a psychiatrist for the program; the officer who responded to defendant's home after she gave birth to S.W.'s sibling; a clinician; and two psychological experts. The judge admitted 132 exhibits into evidence on behalf of the Division. The Law Guardian presented testimony from the resource parent and a psychological expert, as well as introduced five exhibits into evidence. Defendant presented testimony of a psychiatric social worker from the behavioral health program.

A-2073-24

The trial judge issued a comprehensive written decision and detailed how each of the witnesses who testified was credible. He concluded the Division proved each of the statutory best interests prongs under N.J.S.A. 30:4C-15.1(a).

The judge found the Division proved prong one because "[t]he uncontroverted evidence [showed defendant] suffers from severe psychological and psychiatric impairments that have rendered her incapable, to date, of parenting [S.W.]." Defendant's "commitment to staying the course and doing essentially nothing to change or control her mental health status evidence[d] a clear and present danger to [S.W.]'s health, safety[,] and welfare." In addition to crediting the experts' diagnoses of defendant and the deleterious effects on S.W., the judge detailed the history of referrals and the child's corroboration of those incidents as further evidence defendant could not, or would not, be capable of caring for S.W. He noted the caseworkers' testimony further corroborated his conclusion that defendant's condition had not improved despite years of working to provide her with mental health and other services. Defendant's "mental health condition, coupled with her complete failure to acknowledge her mental health issues and her corresponding failure to engage in meaningful treatment[,] . . . [c]ollectively[] . . . pose[d] a real threat to [S.W.]'s safety, health, and development."

A-2073-24

The judge found the second prong of the best interests test was proven by the fact defendant was in the same position as when the case began. Defendant "failed to take advantage of the various services offered to her by the Division consisting of psychological and psychiatric evaluations, mental health treatment referrals, medication management, housing assistance, transportation assistance, searches for relatives and an ICPC evaluation of [the] maternal grandmother and paternal grandfather, and therapeutic visitation."

The judge recounted in detail the nature of these services and how defendant fared in taking advantage of them. Her lack of progress was evidenced by the fact she remained in a group home for adults, which "is no place for a child; and there has been no evidence presented to indicate that if [S.W.] were reunified with her mother that she could live and thrive there." He noted defendant was enrolled in a voluntary program, which did not monitor her daily medication intake and, "[b]y all accounts, [the evidence showed her] compliance with her medication regimen [was] very much in doubt." She had "loose associations and could carry on a conversation, but the conversation was not 'linear.'" At least six witnesses "experienced [defendant]'s grandiose behavior, noting how [she] would describe herself inconsistently as an EMT, a caseworker, and a medical student." Even when defendant participated in

services, such as group sessions, she required redirection and, on occasion, became physically aggressive.

The judge observed defendant's condition did not improve despite the fact she "received the most consistent and intense treatment she had ever received during the Division's involvement." The judge credited the testimony of more than one expert who found defendant could not effectively care for herself, let alone S.W. He concluded her "capacity to parent [S.W.] ha[d] not improved, . . . no evidence ha[d] been presented to show that it will improve any time soon, and there [wa]s no realistic likelihood [she] w[ould] be able to parent . . . any time in the near future."

The trial judge found the Division proved it provided reasonable efforts to reunify defendant with S.W. because, "for nearly five years[,] the Division has provided [defendant] with consistent efforts to provide her with the tools and services needed to stabilize herself and parent [S.W.] safely." The judge recounted at least nine categories of services the Division provided and how defendant failed to take advantage of them. It was "also uncontroverted that the Division's efforts to have [defendant] engage in services ha[d] never stopped. Even at the time of trial[,] the Division presented sufficient credible evidence to

show that it was actively engaged with [defendant] . . . ." The judge rejected defendant's argument the Division took a passive approach to assisting her.

As for exploring relative placements, the judge recounted how the Division twice considered R.S., as well as the paternal grandfather, a paternal uncle, and the biological father's girlfriend. The judge credited the reasons why R.S. was excluded as a placement and explained R.S. withdrew her custody application following mediation with the resource parent "so that [S.W.] could remain with [the resource parent]." The Division contacted at least sixteen potential placements, but they "never responded or chose not to be assessed."

The judge further found the resource parent had a "fully informed commitment to adoption after being advised of and understanding the differences between KLG and adoption." The evidence showed the resource parent had several children in her care, had been a KLG in a different case, and only wanted to adopt S.W.

The judge concluded termination of parental rights followed by adoption would not do more harm than good. "Indeed, adoption by [the resource parent] [wa]s the path toward a continued safe and stable future for [S.W.]." The uncontroverted evidence showed S.W. was thriving in the resource parent's custody "receiving the love, care, and attention . . . she needs and rightfully

A-2073-24

deserves." S.W. participated in several extracurricular activities and was "doing very well academically." He noted she and the resource mother displayed a mutual affection and "[were] always engaged in conversation."

Although S.W. loves defendant, the judge noted she had "no qualms" about expressing her desire to be adopted by the resource mother. "She has stated that to the Division, the Law Guardian, and every expert that has provided an evaluation in this matter." The judge credited the Law Guardian's expert, who explained S.W. "'lost her mother long ago' and views [the resource mother] as her psychological parent because she meets her daily needs." Extensive individual therapy had helped the child process the loss of her mother. Thus, a termination of parental rights would not cause "any significant trauma," and if there was any, the resource mother would "help mitigate any harm to [S.W.] because of the relationship they have developed over the last [five] years."

On the other hand, the judge explained defendant was "caught in a vortex of mental health issues that impact[ed] every facet of her life. Her mental illness essentially prohibits her from obtaining the treatment she needs . . . to maintain a safe and stable environment for [S.W.] . . . ." He credited the Division's expert who testified "that in [the resource parent, S.W.] found a safe and nurturing home where her daily needs are consistently met." Returning S.W. to

16

defendant's care "would place [S.W.] back in the position of being the caretaker for [defendant] rather than the other way around." He concluded defendant was unable to care for S.W. and would not be able to do so in the foreseeable future.

The trial judge found "no evidence in the record that any harm w[ould] occur to [S.W.] should [defendant]'s parental rights be terminated." Defendant was unfit to parent, the child would be harmed if returned to her, and it was contrary to her best interests "to prolong the opportunity of permanency because of [defendant]'s inability and unwillingness to remedy the concerns that led to [S.W.]'s removal."

I.

Our scope of review of a judgment terminating parental rights is limited. N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007). We will uphold a trial judge's fact findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014). Deference is owed to the judge's credibility determinations "based upon [their] opportunity to see and hear the witnesses." N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2006). No deference is given to a judge's interpretation of the law, which we

A-2073-24

review de novo.  N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 183 (2010).

The best interests of the child standard is codified in N.J.S.A. 30:4C-15.1(a), and requires the Division prove by clear and convincing evidence the following four prongs:

> (1) The child's safety, health, or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm;
>
> (3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and
>
> (4) Termination of parental rights will not do more harm than good.

"The four criteria enumerated in the best interests standard are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests."  In re Guardianship of K.H.O., 161 N.J. 337, 348 (1999).

Defendant challenges the trial judge's prong three findings. She contends he should not have deferred to the Division's decision not to place S.W. with R.S. Defendant argues S.W.'s placement with a non-relative resource parent over a fit grandparent violates Titles 9 and 30. She claims the Division used the ICPC as a barrier to prevent the child's placement with family. Moreover, the non-dissolution custody and guardianship processes were used to pit R.S. against the resource parent to determine who was the better parent, which is not a proper consideration under N.J.S.A. 30:4C-15.

Defendant also challenges the judge's prong four findings. She contends the Division did not provide the judge with information about R.S.'s fitness. The judge gave too much weight to R.S.'s withdrawal of the non-dissolution application as well as the resource parent's preference, which was colored by the Division's input.

Pursuant to N.J.S.A. 30:4C-15.1(c), "reasonable efforts to provide services" under prong three means "attempts by . . . the [D]ivision to assist the parents in remedying the circumstances and conditions that led to the placement of the child and in reinforcing the family structure." A court's "evaluation of the efforts undertaken by [the Division] to reunite a particular family must be

done on an individualized basis." In re Guardianship of DMH, 161 N.J. 365, 390 (1999). "'Reasonable efforts' will vary depending upon the circumstances of [a child's] removal." N.J. Div. of Youth & Fam. Servs. v. F.H., 389 N.J. Super. 576, 620 (App. Div. 2007). The Division must focus on reunification, and the services utilized to facilitate this must be "'coordinated' and . . . have a 'realistic potential' to succeed." N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 488 (App. Div. 2012) (quoting N.J. Div. of Youth & Fam. Servs. v. J.Y., 352 N.J. Super. 245, 267 n.10 (App. Div. 2002)). Nevertheless, "[t]he diligence of [the Division]'s efforts on behalf of a parent is not measured by [its] success," DMH, 161 N.J. at 393, particularly where the lack thereof is due to a parent's "failure to cooperate or follow through" with services and obligations. N.J. Div. of Youth & Fam. Servs. v. C.S., 367 N.J. Super. 76, 119 (App. Div. 2004).

N.J.S.A. 30:4C-12.1(a) requires the Division to search for relatives and friends "who may be willing and able to provide the care and support required by the child." Because the best interests of the children are paramount, a parent's desires or objections to potential placements do not dictate the Division's considerations. See N.J. Div. of Youth & Fam. Servs. v. K.L.W., 419 N.J. Super. 568, 577-79 (App. Div. 2011). A "[d]elay of permanency or reversal of

20

termination based on the Division's noncompliance with its statutory obligations is warranted only when it is in the best interests of the child." Id. at 581.

KLG "cannot be used as a defense to the proper termination of parental rights." N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 233 (App. Div. 2013). Trial courts must "consider the totality of the circumstances in deciding whether to terminate parental rights." N.J. Div. of Child Prot. & Permanency v. D.C.A., 256 N.J. 4, 17 (2023).

The fourth best interests prong serves as a "'fail-safe' inquiry guarding against an inappropriate or premature termination of parental rights." N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 453 (2012) (quoting G.L., 191 N.J. at 609). "The question ultimately is not whether a biological [parent] is a worthy parent, but whether a child's interest will best be served by completely terminating the child's relationship with th[e] parent." N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 108 (2008). A "'termination of parental rights likely will not do more harm than good' where the child has bonded with the resource parents in a nurturing and safe home." L.J.D., 428 N.J. Super. at 492 (quoting E.P., 196 N.J. at 108). "The crux of the fourth statutory subpart is the child's need for a permanent and stable home, along with a defined parent-child

relationship." H.R., 431 N.J. Super. at 226. "Overall, the court's focus should be on the child's need for permanency." Id. at 227.

Pursuant to these principles, we are satisfied the trial judge's prong three and four findings were supported by the evidence in the record, and the conclusions drawn from those facts are unassailable. We affirm substantially for the reasons expressed in the judge's well-written opinion and add the following comments.

The judge correctly found the Division met its reasonable efforts obligation under the law. The record is replete with the Division's efforts to locate a relative resource for placement, including but not limited to R.S. However, none of the relatives the Division located were willing to assist. Defendant does not point us to where the record indicates otherwise.

R.S.'s exclusion as a placement was appropriate. The ICPC was not used to thwart placing S.W. with R.S. Because the Division had custody of S.W., it could not legally place S.W. with R.S. without first licensing R.S. The ICPC was the proper means of doing so.

More importantly, the process fulfilled its purpose of helping the Division understand whether it was in the child's best interests to be placed with her grandmother. Although the law provides licensure may be denied if there is "[a]

determination that an incident of child abuse or neglect by a resource family parent applicant . . . has been substantiated," the Division still "may issue the license if [it] determines that the resource family parent applicant . . . poses no continuing risk of harm to the child and the issuance of the license is in the child's best interests." N.J.S.A. 30:4C-27.9(d). The record is clear it was not in S.W.'s best interests to be placed with R.S. because of R.S.'s own history of abusing defendant, about which she was untruthful. S.W. also revealed R.S. had screamed at her and hit her on her arm, during her clinical interview with the Law Guardian's expert.

The record shows the Division's decision regarding R.S. was not based solely on the outcome of the ICPC, but consideration of S.W.'s best interests and the totality of the circumstances. We reach a similar conclusion regarding the trial judge's prong three findings as well.

The remainder of defendant's arguments relating to the judge's prong three and four findings lack merit. We add only that R.S. mediated and then voluntarily withdrew her non-dissolution custody application. The record does not support the contention the judge's findings were founded upon R.S.'s withdrawal of the custody application. He cited several other reasons why it was in S.W.'s best interests to remain with her non-relative placement, who

intended to adopt her, rather than with R.S. The record also does not support any credible argument that something other than the termination of parental rights followed by an adoption by S.W.'s caregiver was in the child's best interests.

III.

Defendant asserts she received ineffective assistance of counsel from her first trial counsel because the attorney did not oppose S.W.'s placement with a non-relative resource parent and allowed R.S. to become adverse to the Division by filing a non-dissolution complaint. Counsel was also ineffective because she retained an expert who had a conflict of interest.

Defendant claims her second trial counsel was ineffective because he did not secure a new expert evaluation, which deprived the trial judge of critical information regarding the bond between R.S. and S.W. She argues counsel was also ineffective because he prevented the Law Guardian's expert from testifying regarding the bond between R.S. and the S.W.

A party in a parental-rights-termination case has a constitutional right to effective counsel. N.J. Div. of Youth & Fam. Servs. v. B.R., 192 N.J. 301, 306 (2007). To establish an ineffective-assistance-of-counsel claim in a parental-rights-termination case, the aggrieved party must meet the two-prong test

24

established in <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), and adopted in <u>State v. Fritz</u>, 105 N.J. 42, 58 (1987). <u>B.R.</u>, 192 N.J. at 308-09. This requires showing trial counsel's performance was deficient and, but for the deficient performance, the result would have been different. <u>Id.</u> at 307-09. Our review is guided by "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance;" the party claiming ineffective assistance of counsel must overcome the presumption "the challenged action 'might be considered sound trial strategy.'" <u>Strickland</u>, 466 U.S. at 689 (quoting <u>Michel v. Louisiana</u>, 350 U.S. 91, 101 (1955)); <u>see also</u> <u>B.R.</u>, 192 N.J. at 307-08.

The arguments regarding the first defense counsel lack merit because there is no evidence the defense acquiesced in S.W.'s placement. Not only was placing the child with a relative resource a central issue for the defense, but also what the Division was statutorily obligated and court ordered to pursue. Although defendant's initial counsel retained an expert who had a conflict of interest, the trial judge gave the defense nearly six additional months to retain a new expert. In turn, counsel retained a new expert who evaluated S.W.

Counsel's decision not to produce the defense expert at trial constituted a strategic decision and was not ineffective assistance of counsel. Initially, we

A-2073-24

note defendant has not provided us with the report on appeal.  See <u>B.R.</u>, 192 N.J. at 311 (noting if a party claims ineffective assistance of counsel resulting from a failure to produce an expert or lay witness, then that party must supply a certification from any such witness detailing "the substance of the omitted evidence along with arguments regarding its relevance").  Regardless, not only did R.S. mediate and withdraw her non-dissolution custody application, but the overwhelming evidence in the record also shows even with the benefit of the defense expert's opinion the outcome would not be different.

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

26